Jack L. PARROTT, Roger Lee Parrott, Rhonda Lynn Rasbeary, nee Rhonda Lynn Parrott, Appellants,

v.

James CASKEY, M.D., and Royce Read, M.D., Appellees.

No. 09–93–011 CV.

Court of Appeals of Texas, Beaumont.

March 31, 1994.

Rehearing Overruled April 20, 1994.

---

John Ament, Jacksonville, for appellants.

Forrest G. Braselton, Nacogdoches, Ralph M. Zelesky, Zelesky, Cornelius, Hallmark, Roper & Hicks, L.L.P., Lufkin, for appellees.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

WALKER, Chief Justice.

This is a medical malpractice action seeking damages for what is alleged to be the premature death of Sandra Jean Parrott and for damages incurred prior to her death. Trial was by jury, at the conclusion of which the trial court instructed a verdict in favor of defendants that the plaintiffs take nothing.

It is from this instructed verdict that plaintiffs make their appeal.

## THE PRELUDE

Factually, Jack L. Parrott is the widower of Sandra Jean Parrott. The other two plaintiffs, Rhonda Lynn Parrott and Roger Lee Parrott, are the surviving adult children of Sandra Jean Parrott. Mr. Parrott was a serviceman in the United States Navy, who, having retired in 1981, then moved to Lufkin, Texas.

In 1981, the Parrott family selected as their family physician, Dr. Royce Read, one of the defendants in this case. Sandra Parrott was seen by Dr. Read off and on over the next several years. Mrs. Parrott was employed by Angelina Periodicals in February or March of 1984, in a position which required physical labor. Mrs. Parrott suffered an injury in the course of her employment in July of 1984. Mrs. Parrott, according to Dr. Caskey's medical records and the testimony of Mr. Parrott, first saw Dr. Caskey on July 25, 1984. According to Mr. Parrott, Mrs. Parrott went to Dr. Caskey at the direction of her employer. Upon first examination, Dr. Caskey prescribed medication, physical therapy and directed Mrs. Parrott not to return to work. Mrs. Parrott again saw Dr. Caskey on July 30, 1984. In early August of 1984, Mrs. Parrott began to experience physical pain and knots began to appear upon her body. Mrs. Parrott returned to Dr. Caskey in August of 1984 and in September of 1984.

Mrs. Parrott's condition continued to deteriorate to the point that she was taken to an emergency room on September 22, 1984, which was her birthday. According to Mrs. Parrott the pain was "coming down from her head, down through her neck, into her back, shoulders, under her arm, her left side and chest area."

The Monday following the emergency room visit, Mrs. Parrott saw Dr. Read in his office for medical treatment. Dr. Read changed Mrs. Parrott's medication but did not perform a breast examination. Mrs. Parrott then returned to see Dr. Caskey on September 24, 1984, who then diagnosed her as having Tietze syndrome, an inflation of the

chest cavity, however, Dr. Caskey did not examine Mrs. Parrott's breasts. On October 5, 1984, Mrs. Parrott again went to Dr. Caskey's office and was treated by him with steroid injections to the shoulder and neck area. On October 11, 1984, Mrs. Parrott again saw Dr. Caskey at a time when the knots were visible on her neck, below and slightly behind her ear.

## THE TRIAL

Mr. Parrott testified that he personally felt the knots in his wife's neck and under her arm and that the knots had been under her arm since August, 1984. Mrs. Parrott had complained about not having energy and hurting as far back as the late Fall and Winter of 1983, at which time Dr. Read prescribed prenatal vitamins for her. Mrs. Parrott last saw Dr. Caskey on October 18, 1984.

Mrs. Parrott was next seen by Dr. C. Roger Lyons at St. John's Department of Defense Clinic at Nassau Bay, Texas. Mr. Parrott, was retired from the Navy so his dependents were eligible for treatment at this clinic. Mr. Parrott testified that "Dr. Caskey continually told her (his wife) that it was all in her mind" and he released her to go back to work on October 18, 1984. This, according to Mr. Parrott, was devastating to his wife. From the record we observe the following discord:

Q. Mr. Parrott, from your observation of your wife, without going into what she might have told you, did she or did she not appear to be relieved at having finally found out what was wrong with her?

A. Yes, sir. She felt relieved. She had—that her illness was diagnosed. She also felt vindicated.

Q. Vindicated?

A. Yes, sir, vindicated.

Q. Vindicated from what?

A. From someone telling her that she was a malingerer, and there was nothing wrong with her, and it was all in her head.

Q. In your opinion did this cause her concern?

A. This caused her great emotional and mental suffering because she was a very proud person. She didn't—she didn't complain unless she had something to complain about it [sic]. She didn't shirk her duties unless she had a reason for not being at her duties. She was hurt very deeply for being portrayed as a person that wouldn't do her job.

Q. Without saying what it was, did you and she discuss this during the course of the time that Dr. Caskey was treating her?

A. Yes, we did.

Q. And state whether or not it's your opinion that this caused her concern likewise?

A. Yes, it did.

Dr. Lyons first saw Mrs. Parrott on November 5, 1984. Mrs. Parrott died on February 17, 1985, having stayed in the hospital in Nassau Bay from November 5, 1984, until the date of her death, except for one week in Houston, Texas.

While at Nassau Bay, Mrs. Parrott's primary treating physician was Dr. Lyons, and an oncologist, David P. Gill.

During those periods of time previously discussed, the Parrott's daughter, Rhonda, was a senior student at Hudson High School, near Lufkin. She lived with Mrs. Parrott's parents while Mr. and Mrs. Parrott were at Nassau Bay. Mr. Parrott related how the children, Rhonda and Roger, were affected during the time their mother was confined to the Nassau Bay area. At the time of her confinement, son Roger was in the Marine Corps undergoing basic training, or "boot camp."

At trial, plaintiffs' attorney posed a hypothetical question to Mr. Parrott, which asked him to assume that his wife's condition was terminal as of July 24, 1984, that she died on February 17, 1985, that a medical doctor would testify that had her cancer been diagnosed earlier, as of July 25, 1984, and that had treatment been instituted at that time, that it would have prolonged her life for a year or two years and based upon those assumptions, what significance would that prolongation of life have played in his consid-

eration of the entire matter? Objection was made to this hypothetical question based upon hearsay and that such a hypothetical question entailed the theory of lost chance. The court sustained the objection.

On cross-examination by Dr. Caskey's attorney, Mr. Parrott was asked to consider that Caskey's records showed office visits for Mrs. Parrott on July 25, July 30, October 5, October 11 and October 18, all in 1984. Mr. Parrott testified that the records were incorrect.

Rhonda Rasbeary, formerly Rhonda Parrott, testified as to biographical facts and the relationship between her mother and her. Rhonda graduated from high school in May of 1985, three months after her mother's death. Upon cross-examination, Rhonda explained that, in this suit, she was seeking damages "for the premature loss of her mother.... I don't believe they made her die. I believe they did not stop it from happening."

Roger Parrot testified that he was in the United States Marine Corps from September 9, 1984 until June 12, 1988, and that he was eighteen years of age when he left for the Marine Corps. Roger's brief testimony explained how he found out about his mother's terminal illness and how it impacted him.

Dr. Carl Wayne Lawrence, a licensed professional counselor, related how the emotional impact of Mrs. Parrott's circumstances would have affected Jack, Rhonda and Roger Parrott.

Dr. C. Roger Lyons testified by way of written deposition. Dr. Lyons testified that he first met Sandra Parrott at 11:18 a.m., November 5, 1984, in the Department of Defense Clinic. Having taken a brief history, Dr. Lyons examined Mrs. Parrott briefly and referred her to the hospital for tests. "[O]n examination the left breast was considerably firmer than the right." Dr. Lyons noted other abnormalities in that area and referred Mrs. Parrott for a blood count and mammogram immediately. At that time, Dr. Lyons felt that Mrs. Parrott had a malignancy in her breast. Dr. Lyons further found swollen lymph nodes under her left arm. Dr. Lyons then explained that he called in spe-

cialists, such as Dr. David Gill, who, along with a surgeon, extracted certain tissue from Mrs. Parrott, had the tissue examined, and diagnosed Sandra Jean Parrott as having adenocarcinoma of the left breast with extensive metastases of the bone. In layman's terms, Mrs. Parrott had breast cancer which had spread extensively.

Further explanations of various tests, results, procedures and treatments were made by Dr. Lyons, all of which were merely cumulative and supportive of the ultimate opinion expressed by him later in the testimony.

Dr. Lyons was asked about his knowledge of Mrs. Parrott having been seen by doctors in Lufkin. He stated that these facts had been made known to him. Dr. Lyons was asked his opinion as to whether or not Mrs. Parrott would have been afflicted with cancer in October 1984. His reply was "[o]h, very definitely. She had it for some little time before we saw her. Cancer doesn't come that fast." It was Dr. Lyons' opinion that the disease had been detectable by a breast examination or mammogram for at least several months before November 1984, and probably longer. Dr. Lyons then specifically stated that "it would have been present for at least four to six months, possibly longer." Dr. Lyons explained that Mrs. Parrott's symptoms would have tipped someone off that she had cancer. It was Dr. Lyons' opinion that Mrs. Parrott would have had breast cancer to the point that it was evident at least three months prior to November 5, 1984.

A nodule, or knot, on Mrs. Parrott's neck was noted in Dr. Caskey's medical records on October 18, 1984. These records were examined by Dr. Lyons. Dr. Lyons then explained the significance of the node and the proper protocol for determining its importance. Dr. Lyons was asked whether the failure by Dr. Caskey to follow through on the examination, which revealed a hard nodule, was a deviation from the accepted standard of care. Dr. Lyons replied in the affirmative. Dr. Lyons felt sure that someone would have found the changes in the breast had they taken the time to examine it.

Dr. Lyons was asked his opinion if the failure to perform a breast examination, un-

der circumstances such as were found surrounding Mrs. Parrott, was a deviation from the accepted standard of care. He replied that "you would certainly have examined the breast." Dr. Lyons testimony is best summed up from the following direct quote:

A. Any time that a patient has any complaint of pain, discomfort, or think they found a knot anywhere from the belly to the neck, they are disrobed, put in the hospital gown, in the presence of the nurse there examined both front and back and breast because you're not sure.

Q. Let me ask it this way. To not do that, in your opinion, is that negligence?

A. Well, if I didn't do it, I would be negligent.

Dr. David P. Gill, board certified in internal medicine and medical oncology, testified that he was familiar with the standards of medical care pertaining to general practitioners in relatively small, mid-sized cities in Texas. Dr. Gill testified that early detection in the care and treatment of cancer, especially breast cancer, is crucial. When Sandra Parrott first visited Dr. Gill, he performed a physical examination upon her and took a complete medical history. Dr. Gill was asked if he had an opinion as to whether or not any reasonably prudent physician should conduct their own physical examination with a patient, to which he replied that in his opinion they should. Dr. Gill testified that he knew when he first saw Mrs. Parrott that, without any biopsies or anything, she had far advanced breast cancer and that she was going to die of breast cancer. Dr. Gill testified that this condition probably had been present for a period of years. When asked if in his opinion Mrs. Parrott had detectable cancer for a period of a year, his response was, "yes."

Dr. Gill was propounded a hypothetical question which asked him to assume that Dr. Caskey was a general practitioner in Lufkin, Texas, that Mrs. Parrott saw him on July 25, 1984, complaining of a pain in the left side of her back near the shoulder blade, and that Dr. Caskey was the company doctor for Mrs. Parrott's employer and that she was presented for medical treatment at that time and date. Dr. Gill was asked if he had an opin-

ion, based on reasonable medical probability, as to whether or not Dr. Caskey should have performed a physical examination upon the lady. Dr. Gill responded that he had no objection to performing a very limited history and physical and to treat the specific problem by prescribing Motrin and that it should go away. Dr. Gill was further asked to assume the facts just stated and add to it that Mrs. Parrott came back on July 30 with essentially the same complaint. Dr. Gill was asked if in his opinion the doctor should have conducted a more thorough physical examination at that time. His answer was that he believed a more thorough history and physical should have been performed. Dr. Gill explained that a physician has to listen to the patient and look for the source of the complaint. When asked if a physical examination of Mrs. Parrott would have included a breast examination, Dr. Gill replied that it would have.

Dr. Gill was questioned as follows:

Q. Doctor, do you have an opinion as to whether or not the doctor who saw Mrs. Parrott on July 25th and July 30th and then again on—on up in October and perhaps according to testimony that's been elicited here in August, although it's not documented—as to whether or not that physician deviated from the accepted standard of medical care?

A. I would say yes.

Q. Doctor, do you have an opinion as to what affect that had on Mrs. Parrott? And when I say "what affect," what I mean by that is how long, or did it hasten her death?

A. Well, again, I have to talk in probabilities here. But clearly at the time I saw Mrs. Parrott, the cancer was far advanced and was not going to be curable with anything that we had. Based on my reading of the records and what had gone on before, I believe that Mrs. Parrott was incurable back in July and perhaps even in the springtime when she had some of those findings. I don't know.

But modern therapy for even advanced breast cancer is effective in a fair per-

centage of patients. 40 percent or more will respond very dramatically to chemotherapy treatments, and we can control her—you know, get some good years out of it when they respond well.

Dr. Gill was further asked his opinion as to whether or not detection as of July 30, 1984, would have made the treatment—the cancer in Mrs. Parrott more treatable by him. Dr. Gill responded that "[i]t would have markedly improved her odds." Dr. Gill testified that based upon probability, had Mrs. Parrott's cancer been detected on July 30 or thereabouts, she would have lived longer than she did.

Dr. Gill's specific testimony was that Mrs. Parrott could have lived a couple of years and that he had patients who had lived much longer than that, up to ten years.

Dr. Gill testified that Dr. Read, on September 24 or 25, 1984, should have performed a physical examination on Mrs. Parrott's breasts. He further testified that it was his opinion that Dr. Read should have performed a complete physical examination and that had he done so, he would have found problems with her breasts.

On cross-examination by Dr. Read's attorney, Dr. Gill was asked what the odds of increasing Mrs. Parrott's life were had the appropriate care started sooner. Dr. Gill replied that in a young, healthy patient with advanced breast cancer, the ability to shrink the tumor with existing types of chemotherapy treatments are on the order of about fifty percent. Overall response rates for breast cancer are about fifty percent. This was contrasted with the effectiveness of chemotherapy treating a debilitated, bedridden patient with pre-existing thrombocytopenia which is probably under ten percent; therefore, the odds or chances are about 30 to 40 percent with early detection. Dr. Gill testified that he would have been able to do a better job treating Mrs. Parrott in September than he could have done in November, when he actually saw her. He stated that he would have done a lot better and controlled her longer. Dr. Gill was asked by Dr. Read's attorney how long he could have prolonged her life had treatment been started in late September of 1984. Dr. Gill replied that several years would be very reasonable.

On examination by Dr. Caskey's lawyer, Dr. Gill stated that had he had an additional eighteen days to treat Mrs. Parrott, he could have "bought her" two years prolongation of life. On further cross-examination by Dr. Caskey's attorney regarding performing a mammogram, Dr. Gill replied "the way you detect breast cancer is you examine the breast. A mammogram is a useful adjunct to that, but it is known to miss 4 to 6 percent of tumors. You will not see them. These guys right here [indicating his fingers] are wonderful diagnostic instruments, especially in a case like this with this huge, fixed, rock hard breast. I don't care what the mammogram shows. That lady needs a biopsy then and there."

On re-direct, Dr. Gill testified that it was his criticism of the defendant doctors that "nobody looked," meaning the defendants had not looked at the breasts. Dr. Gill explained that Mrs. Parrott was a patient who had repetitive complaints that were not responding to normal types of therapy with a presumed initial diagnosis, that there were no follow-ups done and nobody ever examined the part that hurt. It was Dr. Gill's opinion that the defendant doctors deviated from the proper standard of care. Dr. Gill expressed his opinion that Mrs. Parrott's likelihood of survival for an extended period of time was based upon reasonable medical probability.

## APPELLANTS' COMPLAINT

Appellants bring two points of error which we determine should be set forth verbatim.

### POINT OF ERROR NUMBER ONE

The trial court erred in granting defendants' motions for instructed verdict because:

1. There was in the evidence admitted before the jury sufficient evidence to raise fact questions upon the following elements of the cause asserted by the plaintiffs:

A. Negligence

B. Proximate cause

C. Damages

2. The plaintiffs alleged a cause of action for medical negligence for the wrongful death of Sandra Jean Parrott and for damages that were proximately caused by such medical negligence.

3. The trial court incorrectly held that the plaintiffs did not assert a cause of action cognizable at law. In regard to this subsection of the point of error, the trial court incorrectly concluded that plaintiffs' cause of action was based upon the doctrine of loss of chance of survival. Such conclusion was incorrect as a matter of law because the plaintiffs pled and offered admitted evidence that:

A. The defendant doctors violated the applicable standard of medical care;

B. such violations of medical care proximately caused the decedent to die at least two years prior to the time that she would have died based upon reasonable medical probability; and

C. damages were incurred by the deceased for mental anguish before her death and the plaintiffs were damaged as a result of the premature death of Sandra Jean Parrott.

## POINT OF ERROR NUMBER TWO

The trial court erred in sustaining the defendants' special exception and striking the plaintiffs' pleading pertaining to the plaintiffs' cause of action based upon the doctrine of loss of chance of survival and in instructing a verdict upon the basis that no cause of action exists in Texas for the loss of chance of survival, thereby effectively prohibiting the plaintiffs from seeking recovery based upon such cause of action.

A. The cause of action for loss of chance has been recognized by Texas Courts of Appeal;

B. the doctrine of loss of chance of survival should be adopted by the Courts of Texas.

## KRAMER V. LEWISVILLE MEMORIAL HOSPITAL

The primary question before this Court is whether or not the case of *Kramer v. Lewisville Memorial Hospital*, 858 S.W.2d 397 (Tex.1993) effectively abrogates appellants' causes of action. Chief Justice Phillips, author of that opinion, presents the issue "of whether there is a liability for negligent treatment that decreases a patient's chance of avoiding death or other medical conditions in cases where the adverse result probably would have occurred anyway."

In this case of first impression, our Texas Supreme Court held that such recovery was not authorized by the Texas Wrongful Death Act, TEX.CIV.PRAC. & REM.CODE ANN. §§ 71.-002 & § 71.004 (Vernon 1986), and should not be permitted under the Texas Survivorship Statute, TEX.CIV.PRAC. & REM.CODE ANN. §§ 71.021 (Vernon 1986), or under a separate common law cause of action.

## KRAMER FACTS

The facts in *Kramer* are intriguingly similar to the facts in the present appeal. In August 1985, Ms. Kramer visited Dr. Bruce Eich, her gynecologist, because she was experiencing unusual discharges and intermediate bleeding a few days before and after her menstrual period. Dr. Eich, observing that her cervix was inflamed, diagnosed her condition as a yeast infection. Dr. Eich performed a pap smear and sent a microscope slide of the smear to Lewisville Memorial Hospital for screening. Cytotechnologist, Francis Nightingale, the hospital's laboratory director, screened the slide and detected no abnormal cells that might indicate cancer. Dr. Richard Burgess, a pathologist employed by the hospital, was Ms. Nightingale's supervisor. Dr. Burgess' examination found the slide negative for cancer.

Due to continued irregular bleeding, Ms. Kramer consulted Dr. Michael Burgess, who was not related nor affiliated with Dr. Richard Burgess. Dr. Michael Burgess diagnosed Ms. Kramer's condition as normal. Ms. Kramer's bleeding became more severe and in December 1985 she detected a hardening in her cervix. She returned to Dr. Michael Burgess who, in spite of these new developments, concluded that nothing further needed to be done. In February, 1986, after continued episodes of irregular bleeding, Ms. Kramer detected a hard spot in her vagina. She again returned to Dr. Michael Burgess

who performed a cervical biopsy and diagnosed her condition as cancer. Ms. Kramer ultimately died on October 31, 1986.

Mr. Kramer, individually, and as representative of Jennie Kramer's estate, and as next friend of their children, brought suit under the Texas Wrongful Death Act and the Texas Survivorship Statute. All defendants except the hospital settled with the Kramers prior to trial. The Kramers amended their petition to allege a cause of action for the "significant and substantial reduction in the chance of saving" Ms. Kramer's life. The plaintiffs in Kramer viewed this pleading as being wholly independent of either the Wrongful Death Act or the Survivorship Statute, and argued to the Supreme Court that it was based solely upon the common law. The Kramer opinion denying recovery effectively slammed the door on all causes of action alleged. Seemingly this closed door also excludes the Parrotts' causes of actions and sends them forth without day. Is there significant distinction between Kramer and Parrott to allow at least a crack through which the Parrotts' may find recompense?

## THE WRONGFUL DEATH ACT

■ We first address appellants' claim for recovery under the Texas Wrongful Death Act. We forego any detailed discussion of the applicability of the Wrongful Death Act in situations similar to the one before us. *Kramer* did, at length, extinguish any and all possibilities for appellants recovery under this act. Chief Justice Phillips, writing for the majority, sets forth the following:

Under the Wrongful Death Act, liability may be predicated only on 'an injury that causes an individual's death.' ... First, the Act authorizes recovery solely for injuries that cause *death*, not injuries that cause the loss of a less-than-even chance of avoiding death. Hence, the Act on its terms does not authorize recovery under the separate injury approach to loss of chance.

Second, the Act authorizes claims only for actions that actually *cause* death. In construing a statute, if the Legislature does not define a term, we will apply its ordinary meaning.... Under this construc-

tion, negligent conduct is a cause of harm to another if, in a natural and continuance sequence, it produces an event, and without the negligent conduct such event would not have occurred.

858 S.W.2d at 404. In adherence to this recent precedent, we hold that appellants' action to recover under the Wrongful Death Act must also fail. A viable cause of action under the Wrongful Death Act would allow recovery for pecuniary losses, losses of companionship and society, and mental anguish suffered by claimants. The absolute key to recovery under this Act, as this Court interprets both the Act and Kramer, is the requirement of showing that the decedent's death was in fact brought about by the negligent act or acts of a defendant. There is no evidence in the case before us to rebut the fact that Mrs. Parrott, in spite of the failure by the defendant doctors to properly diagnosis her terminal illness, would not have died had that illness been properly diagnosed. In Wrongful Death Act actions the negligent conduct complained of must bring about the result, i.e., the death of the person through which those statutorily defined beneficiaries may seek redress. We find no evidence that the alleged negligent conduct of Drs. Caskey and Read deprived Mrs. Parrott of anything more than a less-than-even chance of survival. We do find in the evidence medical testimony supportive of the prolongation of Mrs. Parrott's life by two to eight years but for the negligent diagnosis by appellants.

We understand a portion of appellants' point of error one as contending that the medical negligence of appellees wrongfully brought about the death of Sandra Jean Parrott. Appellants contend that there was sufficient evidence supportive of their cause of action under the Wrongful Death Act to show negligence, proximate cause and damages. Appellants must fail in this contention due to a total lacking of causation evidence. For argument sake we agree that the record exhibits sufficient evidence to raise a fact question regarding appellees' negligence and perhaps damages. However, without the proximate cause connector for these two elements, the trial court was correct in directing a verdict in favor of the defendants that

appellants take nothing under their Wrongful Death Act claim. We therefore overrule appellants' point of error one as same relates to their claim for recovery under the Wrongful Death Act.

## THE SURVIVAL STATUTE

■ We now examine appellants' claim under TEX.CIV.PRAC. & REM.CODE ANN. § 71.021 (Vernon 1986), known as the Survival Statute. The Survival Statute does not create a new cause of action, but provides that "[a] cause of action for personal injury to the health, reputation, or person of an injured person" survives the death of the injured party "to and in favor of the heirs, legal representatives, and estate of the injured person."

In order for a cause of action to trigger applicability of the Survival Statute, that cause of action must exist at common law. Assuming a common law basis for a cause of action, the Survival Statute simply allows that cause of action to survive the death of the aggrieved party in favor of his/her heirs, legal representatives and estate. Prior to Kramer, no Texas Appellate Court had specifically adopted the doctrine of loss of chance. Kramer, in a footnote, recognized that two Texas cases appear sympathetic to the doctrine. 858 S.W.2d at 402. However sympathetic those cases may be, Kramer specifically and clearly refuses to recognize or adopt the loss of chance doctrine as a part of the common law of Texas. 858 S.W.2d at 403. The dissent in Kramer presents at least five arguments supportive of the theory of loss of chance of survival. Each of these arguments present credible address to the need for an opening of the door to the loss of chance theory of recovery. Presently, even where negligence or gross negligence is clearly established, recovery will not be allowed.

The majority in Kramer expresses its serious concern for the overall effect which the adoption of the loss of chance doctrine would have outside the medical malpractice area. We agree that such potential exists. We do not believe this to be the concern nor reason for the Kramer Court's refusal to adopt the loss of chance theory of recovery.

We understand our Supreme Court's reason in refusing to adopt the loss of chance doctrine to be based in the concern for reducing the degree of certainty required in establishing causation. Whether judicial philosophies be conservative or liberal, the one common and transcending threat should be the refusal to adopt a standard of proof by mere possibility. To reduce the standard of proof as to causation from the "more likely than not" standard would set a dangerous precedent.

The majority in Kramer discusses the truth-seeking function of the law and this certainly should be the mandate of all courts. The truth in the matter before us is that there was sufficient evidence in the record to show that Mrs. Parrott suffered a wrong for which no legal remedy is provided. Equity will not suffer a wrong to go without remedy, however, equitable principles do not apply where recovery is disallowed as a matter of law.

The Survival Statute authorizes recovery of all damages which the injured party, if living, could recover. The Act provides in part as follows:

(a) A cause of action for personal injury to the health, reputation, or person of an injured person does not abate because of the death of the injured person or because of the death of a person liable for the injury.

■ Although Kramer forecloses any possibilities of appellants to proceed under any theories of loss of chance, we do not believe Kramer forecloses the decedents cause of action for damages resulting from that period of time which Drs. Read and Caskey should have determined her cancerous condition, until such time that she was properly diagnosed as having cancer. We have previously set forth that in early August of 1984, Mrs. Parrott began experiencing physical pain and knots upon her body. Mrs. Parrott sought medical evaluation from Dr. Caskey in August of 1984 and in September of 1984. On September 22, 1984, Mrs. Parrott was taken to the emergency room experiencing pain in her head, down through her neck, and to her back and shoulders, under her arms, her left

side and chest area. The Monday following the emergency room visit Mrs. Parrott saw Dr. Read at his office for medical treatment. Dr. Read did not perform a breast examination. Finally, in November 1984 Mrs. Parrott was properly diagnosed as having cancer. Dr. Lyons testified that Mrs. Parrott would have had breast cancer to the point that it was evident at least three months prior to November 5, 1984.

We see no reason why appellants should not be able to pursue an action under the Survival Statute for personal injuries suffered by decedent from the date of alleged negligence of Drs. Read and Caskey to the date that Mrs. Parrott was finally properly medically diagnosed. The Statute not only provides for personal injury to the health of Mrs. Parrott, but also to the reputation of Mrs. Parrott.[1]

Justice dictates that this Court sustain that portion of point of error one (1) which contends that there was evidence admitted before the jury sufficient to raise fact questions upon elements of negligence, proximate cause and damages. Our sustaining of that portion of point of error one requires a remand to the trial court for trial on the merits regarding these stated elements for the period of time of the negligent diagnosis to the time of the proper diagnosis.

We overrule the remaining portion of appellants' point of error one and further overrule point of error two in its entirety.

## AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

1. Evidence at trial indicated possible accusations that Mrs. Parrott's problems were "in her head" indicating that she was malingering.

1. Particularly galling is the reference to legal malpractice. Loss of a case simply does not equate to loss of life. As pointed out by Justice Hightower in his dissent, other states have limit-

BURGESS, Justice, concurring.

I wholeheartedly concur with the Chief Justice's reversal and downheartedly concur in the affirmance. I write only to lament the sorry state of our jurisprudence as evidenced by *Kramer v. Lewisville Memorial Hospital,* 858 S.W.2d 397 (Tex.1993), wherein a majority of our supreme court denies a remedy to the family of Sandra Jean Parrott. While each of the survivors suffered a unique loss through the death of a wife and mother, the loss suffered by Rhonda Lynn Parrott is particularly poignant. In August of 1984, when Sandra Parrott first sought medical treatment and advice from Dr. Caskey, Rhonda Lynn was just beginning her senior year of high school. Sandra Parrott died in February 1985, leaving Rhonda Lynn motherless three months before high school graduation and all the functions and events surrounding such a momentous occasion in a young girl's life. All of Chief Justice Phillips' justifications for failing to adopt the "loss of chance" doctrine, *Kramer,* 858 S.W.2d at 405–406, pale in light of Rhonda Lynn's loss.[1]

On September 10, 1993, the family of Jennie Kramer lost their day in court forever. If the voters of this state become incensed enough about that injustice, perhaps the family of Sandra Jean Parrott will not suffer the same injustice.[2]

ed the cause of action to medical malpractice. *Kramer,* 858 S.W.2d at 410.

2. Two members of the 6–3 majority, Justice Gonzalez and Justice Hecht, face opposition in the general election of 1994.