Frank GILBERT and Patricia Gilbert, individually and on behalf of the Estate of Darryl Gilbert, Plaintiffs,

v.

TEXAS MENTAL HEALTH AND MENTAL RETARDATION, The Rusk State Hospital, Robert Arizpe, Elwin Upton, M.D., David Mainz, M.D., Carol Smith, R.N., Doyle Edward Bruce, Lynda Roberson, Patsy Langston, R.N., Gary Bramlett, James H. Harper, Defendants.

No. 6:95cv387.

United States District Court, E.D. Texas, Tyler Division.

March 12, 1996.

---

Richard Anthony Lavallo, Austin, TX, Deborah Cortez Hiser, Austin, TX, Joe K. Crews, Pluymen & Ivy, P.C., Austin, TX, for plaintiffs.

Dennis R. Garza, Asst. Atty. Gen., Attorney General's Office, Austin, TX, Dona Glimm Hamilton, Office of Attorney General, Austin, TX, for Texas Mental Health and Mental Retardation, Rusk State Hospital, Steve Shon, M.D., Robert Arizpe, David Mainz, Carol Smith, Doyle Edward Bruce, Linda Roberson, P. Langston, Gary Bramlett, James H. Harper, and all defendants.

Dennis R. Garza, Asst. Atty. Gen., Attorney General's Office, Austin, TX, Linda M. Kearney, Attorney General's Office, Austin, TX, Dona Glimm Hamilton, Office of Attorney General, Austin, TX, for Elwin Upton, M.D.

Dona Glimm Hamilton, Office of Attorney General, Austin, TX, for Chester Smith and Raymond Crane, defendants.

Dennis R. Garza, Asst. Atty. Gen., Attorney General's Office, Austin, TX, for Connell Foreman, Linnis Ward, L. Henderson, Glenda Hackney, Debbie Rushing, Kenneth Bingham, Marvin L. Warren, Sandra Brantly, Horace Lewis, Tracy Sessions.

### MEMORANDUM OPINION

JUSTICE, District Judge.

Two motions for summary judgment, one from defendant Upton and one from the remaining defendants, are currently pending. Because genuine issues of material fact remain with respect to underlying liability and entitlement to qualified immunity, defendants' motions will be denied.

### I. Factual Background

Plaintiffs Frank and Patricia Gilbert are the parents of Darryl Gilbert, who died while involuntarily committed to Rusk State Hospital (RSH). Gilbert[1] died of a perforation of the small bowel with subsequent peritonitis and septic shock. The cause of the perforation is disputed, with defendants presenting evidence suggesting that the perforation resulted from natural causes or ingestion of a foreign object, and plaintiffs presenting evidence that some blunt force trauma, specifically an assault or a fall, caused the perforation. At the time of his death, Gilbert was covered with numerous unexplained bruises.

Gilbert suffered from severe mental retardation and depression. His parents cared for him, almost exclusively, throughout his life. During late 1991 and early 1992 Gilbert's self-help skills began to deteriorate, and his parents had increasing difficulty caring for him. They sought explanations for these regressions from various doctors, but no satisfactory explanation was found. In addition, Gilbert was admitted for brief periods to St. Luke's Hospital, CASA Hospital, and the Beaumont State Center.

Gilbert was first admitted to RSH on September 25, 1992. On October 4, 1992, Gilbert's parents removed him from RSH because they observed bruises on his body. Gilbert was readmitted to RSH on November 20, 1992. He was assigned to the Multiple Disabilities Unit (MDU). A body check performed at admission showed that Gilbert had

---

1. "Gilbert" will be used to refer to Darryl Gilbert. His parents will be referred to by their full names.

old bruises at his knees and a bruise on his shoulder.

At this time, Defendant Arizpe was the Acting Superintendent of RSH. Defendant Upton was Gilbert's attending physician and a member of his treatment team. Defendant Roberson was the MDU Director and a member of Gilbert's treatment team. Defendant Harper was Gilbert's psychologist and treatment team coordinator. Defendant Bruce was the MDU nursing supervisor. Defendant Carol Smith was the MDU evening nursing supervisor. Defendant Bramlett was the MDU social worker and a member of Gilbert's treatment team. Defendant Mainz was Gilbert's treating physician the night before his death, and defendant Langston was the nurse responsible for Gilbert that evening.

During his first commitment to RSH, some geri-chair use and one-to-one supervision were ordered for Gilbert. Nevertheless, on arrival at RSH for the second admission, Gilbert's parents' offer to leave his wheelchair for his use was refused, and neither wheelchair nor geri-chair use were ordered.

On November 23, 1992, Gilbert fell in the shower. On November 24, 1992, Defendant Upton saw Chester Smith, a non-defendant direct care worker, abuse Gilbert by pressing his knee into Gilbert's head, lifting Gilbert onto a couch, and forcing Gilbert down by putting his hand over Gilbert's face. At that time, Upton smelled alcohol on Smith's breath. Upton dealt with this abuse by talking with Smith, but did not report the abuse or examine or treat Gilbert. On November 25, 1992, Gilbert fell down a flight of stairs. Bramlett and Harper were present during, but did not witness, the fall. Additionally, Gilbert was, at times, noncompliant. As a result he would fall or require physical intervention by staff. The bulk of the bruises present at Gilbert's death went unreported and untreated. No one responsible for Gilbert's safety ensured elevator or geri-chair use until November 30, despite Gilbert's repeated falling injuries.

On December 1st, during a commitment hearing, Gilbert complained of chest pains and was taken to the Diagnostic Service Center for treatment and testing. No serious physical ailments were detected. Gilbert remained in the medical unit overnight for observation and treatment. He died in the early morning hours of December 2, 1992.

## II. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law underlying the claims in issue identifies which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If any such facts are genuinely in dispute, summary judgment is inappropriate. A factual dispute is "genuine," if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

When ruling on a motion for summary judgment, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 975 (5th Cir.1991). The judge is not to weigh the evidence, nor engage in credibility determinations. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510.

## III. Summary Judgment Evidence

Plaintiffs and defendants have each objected to certain of the summary judgment evidence presented by the opposing side. Summary judgment evidence must be admissible, although the non-moving party's evidence need not be in strictly admissible form. *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 191 (5th Cir.1991).

## A. Defendants' Objections

The non-Upton defendants object to the affidavits of Dr. Barbara Wolf, Dr. Norman Blumberg, and Karen Gehle on the ground that their affidavits vary from their deposition testimony. This is not a basis, however, for excluding summary judgment evidence:

> In reviewing a motion for summary judgment the court must consider all of the evidence before it, including affidavits that conflict with deposition testimony. A genuine issue of material fact may be raised by such an affidavit "even if it conflicts with earlier testimony in the party's deposition."

*Dibidale of Louisiana, Inc. v. American Bank & Trust Co.*, 916 F.2d 300, 307 (5th Cir.1990) (quoting *Kennett–Murray Corp. v. Bone*, 622 F.2d 887, 893 (5th Cir.1980)). The challenged affidavits will not be excluded on this ground.

Defendants further challenge certain of Dr. Blumberg's findings because these findings are preceded by phrases such as "it appears." Such language does not render these findings and conclusions inadmissible. Fed.R.Evid. 702, 703. Similarly, defendants challenge Dr. Wolf's affidavit as extending beyond her area of expertise. This argument is without merit. A pathologist should be expected to comment knowledgeably on the cause of death of a patient, and Dr. Wolf's challenged affidavit goes to the connections between the quality of care afforded Gilbert and his death. Accordingly, the three affidavits challenged by the non-Upton defendants will be considered for the purposes of deciding their motion for summary judgment.

Defendant Upton also objects to the affidavits of Dr. Barbara Wolf, Dr. Norman Blumberg, and Karen Gehle. Upton advances the discrepancy between affidavits and depositions discussed above, and argues further that these three witnesses are not qualified to comment on his exercise of professional judgment. The first ground will be rejected for the reasons given above. As to the second ground, each of the experts is qualified, for the purposes of defending the summary judgment motion, to give the testimony he or she gives about Dr. Upton. For example, Gehle, who provides the most extensive testimony regarding Dr. Upton, is a psychologist with expertise in the treatment of persons with dual diagnoses of mental illness and mental retardation. Accordingly, these affidavits will be considered in deciding defendant Upton's motion for summary judgment.

## B. Plaintiffs' Objections

Plaintiffs have raised a number of objections to the non-Upton defendants' summary judgment evidence, but do not object to Upton's summary judgment evidence. Plaintiffs first object to the affidavit of Yolanda Rodriguez, pointing to defendants' failure to identify Rodriguez as a fact witness as required by the Civil Justice and Delay Reduction Plan ("the Plan"). For the purposes of this summary judgment motion, her affidavit will be admitted.

Next, plaintiffs challenge the affidavit of defendant Mainz, arguing that it is conclusory and therefore insufficient to support a motion for summary judgment. The sufficiency of the evidence presented will, however, necessarily be considered in ruling on the merits of defendants' summary judgment motions. With this in mind, defendant Mainz' affidavit will not be stricken.

Plaintiffs next attack the affidavit of Susan Stone, charging that she was not identified as a potential witness or expert witness. Defendants are willing to have the court disregard Stone's affidavit. Accordingly, Stone's affidavit will not be considered.

Plaintiffs complain of a portion of defendants' exhibit U. Exhibit U is an autopsy report, to which lists of medical articles and case studies have been appended. Plaintiffs object to these lists on the ground that they were not disclosed and that they are inadmissible hearsay. Defendants represent that they received these documents from plaintiffs. Accordingly, pursuant to rule 102 of the Federal Rules of Evidence, exhibit U will be considered in full for the purposes of summary judgment.

Finally, plaintiffs object to the report of Dr. Homer Goehrs on hearsay

grounds. The Plan provides for experts to give summaries of their testimony through reports. As a result, exhibit W will not be stricken on hearsay grounds.

## IV. Analysis

### A. Constitutional Claims

■ Defendants argue that they are entitled to judgment as a matter of law on plaintiffs' constitutional claims. These claims rest on the rights of involuntarily committed individuals: the rights to adequate food, shelter, clothing, and medical care; the right to safe conditions; the right to freedom from bodily restraint; and the right to minimally adequate or reasonable training to ensure safety and freedom from undue restraint. *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

■ Deprivation of these rights by virtue of mere negligence is insufficient for § 1983 liability. *Daniels v. Williams,* 474 U.S. 327, 332–34, 106 S.Ct. 662, 665–67, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). The standard of care against which defendants must be measured in this action is the professional judgment standard explained in *Youngberg:*

> [L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment.

*Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462. The United States Court of Appeals for the Fifth Circuit has recently questioned this standard, but expressly declined to reevaluate it, noting: "It is not for us to announce that the Supreme Court has overruled *Youngberg." Hare v. City of Corinth,* 74 F.3d 633, 647 (5th Cir.1996).

■ Defendants rely heavily on the contention that plaintiffs allege only failures to act. Assuming, for the moment, the accuracy of this characterization, defendants' apparent belief that there cannot be § 1983 liability for omissions is incorrect. *See, e.g., Doe v. Rains County Indep. Sch. Dist.,* 66

F.3d 1402 (5th Cir.1995). Furthermore, the nature of the rights at stake here is such that they may be violated by failures to act. *See Youngberg,* 457 U.S. at 315, 102 S.Ct. at 2457 (characterizing the issue in the case as "failing to provide constitutionally required conditions of confinement"). Recently, the Fifth Circuit has explained the standard for showing who, "other than the immediate perpetrator, may be held liable under § 1983." *Doe v. Rains,* 66 F.3d at 1407. In order to make out a claim under § 1983, plaintiffs will have to show that the individual defendants, acting under color of state law, were either the "immediate perpetrator[s]" of the constitutional deprivation, *Doe v. Rains,* 66 F.3d at 1407, or had "responsibility for [Gilbert's] welfare and [the] concomitant right to exercise control over [the constitutional violator]." *Doe v. Rains,* 66 F.3d at 1417.

■ Construing the facts in the light most favorable to the plaintiffs, it appears that during his brief stay at RSH, Gilbert fell down a flight of stairs, was abused by a direct care worker, suffered numerous unexplained and undocumented injuries, and died from a treatable medical condition. There is also evidence suggesting this ultimately fatal condition was caused by an assault or a fall while at RSH. These events raise genuine issues of material fact as to whether Gilbert was deprived of his constitutionally guaranteed rights to safe conditions, adequate treatment, and minimally adequate training. What remains for plaintiffs, if they are to survive defendants' motions for summary judgment, is to demonstrate that questions of fact exist as to individual defendants' involvement in these deprivations and their failures to exercise professional judgment.

### 1. Upton

■ Upton was Gilbert's treating psychiatrist at RSH, and, according to Roberson, the head of Gilbert's treatment team. Plaintiffs challenge, for example, his failure to order training or other protective measures for Gilbert and his failure to treat or attempt to prevent Gilbert's bruises and falls. There is record evidence suggesting that Upton had knowledge of Gilbert's gait problems and au-

thority to make changes in his treatment. Furthermore, Upton was present when Chester Smith, a direct care worker, abused Gilbert. He did not stop, chart, or report this incident. He did not provide treatment for Gilbert after the abuse, and did not take any measures to prevent further abuse. Gilbert's parents have provided testimony that had they learned of this abuse, they would have removed Gilbert from RSH. The record as a whole shows that genuine issues of material fact remain with respect to Upton's exercise of professional judgment and his failure to provide Gilbert with safe conditions, adequate medical care, and minimally adequate training.

### 2. Arizpe

■■■ Arizpe was the Acting Superintendent of RSH during both of Gilbert's admissions. He had no direct responsibility for Gilbert's care, but was responsible for the training, supervision, and discipline of RSH physicians and staff and was ultimately responsible for the welfare of RSH patients. Arizpe knew of regular failures to report abuse and of the dangers that these failures posed to patients. He had statutory duties that arose upon reports of abuse, and statutory duties to train employees to make such reports. Plaintiffs have raised genuine issues of material fact regarding Arizpe's failure to properly train physicians and other workers at RSH. Furthermore, in light of Chester Smith's unreported abuse, and Gilbert's unexplained bruising and the accompanying absence of treatment for that bruising, issues of fact remain regarding the causal link between the failure to train and Gilbert's injuries.

*Youngberg*—in which the petitioners were the Superintendent, Director of Residential Life, and Unit Director—suggests that officials such as superintendents may be held directly liable for violations of the rights to safe conditions and adequate medical treatment if they know, or should have known, of the violations. *Youngberg,* 457 U.S. at 310, 102 S.Ct. at 2455. If this is the case, issues of fact remain regarding Arizpe's liability. As Acting Superintendent, by statute, he should have known of any significant injuries

to Gilbert. Any absence of knowledge is traceable to his failure to properly fulfill his duty to train RSH physicians and workers. Alternatively, plaintiffs have raised genuine issues of material fact with respect to Arizpe's liability under the causation analysis set forth in *Doe v. Rains.* 66 F.3d at 1412–16.

It is not clear whether Arizpe's actions should be measured by the professional judgment standard, which is the standard of care for the underlying constitutional violation, or the deliberate indifference standard, which is the standard applied in *Doe v. Rains.* 66 F.3d 1402. However, it is not necessary to reach this question on the instant facts. Arizpe's knowledge of the abuse and injury reporting problems at RSH is sufficient to raise an issue of fact as to whether Arizpe's failure to correct these problems evinces deliberate indifference to the constitutional rights of Gilbert and other RSH patients.

### 3. Roberson

■■■ Roberson, Program Director of the Multiple Disabilities Unit and a member of Gilbert's treatment team, was ultimately responsible for Gilbert's safety. She knew Gilbert was at risk for falling injuries, and had suffered unexplained bruising, but failed to take measures to prevent additional injuries. Gehle, one of plaintiff's experts, concludes that Roberson's failure was inconsistent with professional judgment. Accordingly, she is not entitled to summary judgment.

### 4. Harper

■■■ Harper had the authority to make decisions regarding Gilbert's treatment, and was the coordinator of Gilbert's treatment team. He witnessed Gilbert's fall down a flight of stairs on November 25, 1992, and is not certain whether he suggested use of a geri-chair in the wake of the fall. Additionally, there is evidence that Harper felt Gilbert's falling was volitional, and that failure to address this problem shows an absence of professional judgment. There is evidence tending to show that Harper relied on the judgment of non-professionals with respect to Gilbert's non-responsiveness and that this reliance contravenes professional judgment

and endangered Gilbert. Harper was also responsible for Gilbert's treatment plans. These plans did not list as primary concerns Gilbert's noncompliant behaviors, nor did they provide means for staff to respond to the noncompliant behaviors by providing Gilbert the proper guidance and training. There is evidence that this failure both endangered Gilbert, and was inconsistent with the exercise of professional judgment. Plaintiffs have raised genuine issues of material fact regarding Harper's exercise of professional judgment and the relationship between this failure and denial of safe conditions. Accordingly, Harper is not entitled to summary judgment.

### 5.  Bruce

■■■ Bruce was the MDU nursing supervisor. Genuine issues of material fact remain regarding Bruce's failure to ensure Gilbert's safety. Bruce knew or should have known of Gilbert's difficulty walking, but did not require elevator use or a geri-chair. Summary judgment evidence suggests that such recommendations were his responsibility. Such orders might have prevented Gilbert's fall downstairs, which might, in turn, have prevented Gilbert's death. There is also summary judgment evidence tending to show that while under Bruce's care, Gilbert suffered numerous undocumented and unexplained bruises. It was Bruce's responsibility to supervise nursing care, but he was nevertheless unaware of Gilbert's bruising until November 30, 1992. There is evidence that this failure to properly supervise other nurses, and to record and treat Gilbert's bruises, represents a failure to exercise professional judgment. Summary judgment as to Bruce is not warranted.

### 6.  Carol Smith

■■■ Smith was a Nursing Supervisor, responsible for Gilbert's safety. There is evidence suggesting that she knew of Gilbert's gait problem and of his fall on November 23, and did not modify his treatment to protect him from additional falls, including the November 25 fall. The incident of alleged abuse by Chester Smith took place while Gilbert was under defendant Smith's care.

Defendant Smith's testimony suggests that she should have known of any bruises or injuries to Gilbert. Smith was also responsible for Gilbert's medical care. She examined Gilbert after the November 25 fall and failed to detect any serious injury. There is evidence suggesting that these failures may have led to his death, and may amount to a failure to exercise professional judgment. These factual issues preclude an award of summary judgment for Smith.

### 7.  Bramlett

■■■ Defendant Bramlett was the MDU social worker at the time of Gilbert's death and a member of Gilbert's treatment team. He was present when Gilbert fell downstairs. One of his responsibilities was to maintain contact with client families; in particular, he was to inform families of injuries to or regression by clients. The Gilberts have testified that had they been told of Gilbert's November 25 fall, they would have taken him from RSH to a hospital for examination. Additionally, Bramlett failed to discuss the fall and means of protecting Gilbert from future falls with Gilbert's treatment team, and there is evidence that this failure may constitute a failure to exercise professional judgment and may have led to further injuries to Gilbert. Accordingly, Bramlett is not entitled to summary judgment.

### 8.  Mainz

■■■ Mainz was the doctor who cared for Gilbert on December 1st, the night before his death. He did an abdominal examination, but did not detect any serious medical problem. There is evidence tending to show that Mainz misdiagnosed Gilbert, and that Gilbert's death could have been avoided with a proper diagnosis. Furthermore, there is evidence tending to show that Mainz's care of Gilbert was inconsistent with the exercise of professional judgment. Accordingly, he is not entitled to summary judgment.

### 9.  Langston

■■■ Nurse Langston was on duty the night of December 1st, and monitored Gilbert. She noted changes in his vital signs and the presence of a rounded hard abdo-

men, but did not alert a doctor. There is evidence tending to show that the level of monitoring provided and the failure to report changes in Gilbert's condition amount to a failure to exercise professional judgment in the treatment of Gilbert. Appropriate treatment might have prevented Gilbert's death. Accordingly, Langston is not entitled to summary judgment on this issue.

### B. Qualified Immunity

█ The rights at issue in this action were clearly established at the time of the challenged events. In order to overcome defendants' qualified immunity, plaintiffs will have to demonstrate that defendants failed to exercise or rely upon professional judgment. Sept. 26, 1995 *Memorandum Opinion* at 20. At this stage of proceedings, in order to proceed to trial despite defendants' assertion of qualified immunity, plaintiffs must raise genuine issues of material fact as to this issue. As discussed above, plaintiffs have made that showing, and a ruling on qualified immunity must await resolution of fact issues at trial.

### C. Wrongful Death Claim Against Langston

█ Genuine issues of material fact remain with respect to Langston's negligence. As discussed above, plaintiffs have introduced evidence tending to show that the care Langston provided Gilbert was inconsistent with professional judgment. This same evidence creates genuine issues of material fact with respect to Langston's negligence.

### D. Wrongful Death Claim Against Upton

█ Plaintiffs also bring a statutory wrongful death claim against Upton. In order to show Upton's liability for wrongful death, plaintiffs must show that Upton's "wrongful act, neglect, carelessness, unskillfulness, or default" caused Gilbert's death. Tex.Civ.Prac. & Rem.Code § 71.002(b). Up-

ton argues, first, that he is entitled to official immunity for any failure to report Chester Smith's abuse of Gilbert. This argument need not be reached, as the summary judgment record shows that Upton may have wrongfully or negligently caused Gilbert's death by other means. Plaintiffs have raised genuine issues of material fact regarding, for example, Upton's duties to Gilbert as his psychiatrist and a member of Gilbert's treatment team, Upton's knowledge and treatment of Gilbert's risk of falling injuries, his knowledge and treatment of Gilbert's bruises, and his treatment of Gilbert following Smith's abuse. As discussed above, the cause of death remains in issue. On the record now presented, it is possible that Upton negligently failed to diagnose and treat Gilbert and that such failure led to Gilbert's death.[2] Accordingly, summary judgment on the wrongful death claim is not warranted.

### E. Americans with Disabilities Act and the Rehabilitation Act

█ TDMHMR and RSH[3] argue that plaintiffs have failed to state a claim or raise genuine issues of material with respect to their ADA and Rehabilitation Act claims. The ADA requires that:

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Section 504 of the Rehabilitation Act makes essentially the same provision, although its reach is limited to "programs or activities receiving Federal financial assistance." 29 U.S.C. § 794. Plaintiffs, in urging their claim, point to defendants TDMHMR and RSH's failure to accommodate Gilbert's pes planus gait pattern. Under the statute, qualified individual is defined as:

---

2. The cases cited by Upton, *Kramer v. Lewisville Memorial Hosp.*, 858 S.W.2d 397 (Tex.1993), *Parrott v. Caskey*, 873 S.W.2d 142 (Tex.App.—Beaumont 1994, no writ), are distinguishable in that the decedents in those cases did not suffer from treatable conditions, breaking the causal chain.

3. In the Third Amended Complaint, plaintiffs identify RSH as an agency of the state of Texas. Although RSH is not named in the ADA claim, an attempt to state a claim will be inferred by this identification.

an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). This definition includes Gilbert, and would appear to contemplate the accommodations of his gait which plaintiffs charge as the basis for their claim. Genuine issues of material fact remain with respect to accommodation of this gait disability. Accordingly, summary judgment is inappropriate.

## V. Conclusion

On the record before the court, summary judgment is inappropriate. Plaintiffs have raised genuine issues of material fact with respect to each element of the claims against defendants. In addition, defendants' entitlement to qualified immunity remains at issue, as immunity will turn on the resolution of fact issues at trial. Accordingly, it is

**ORDERED** that Upton's motion for summary judgment shall be, and is hereby, **DENIED.** It is further

**ORDERED** that the remaining defendants' motion for summary judgment shall be, and is hereby, **DENIED.**