IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 94-41113

---

JOHN DOE and JANE DOE, as Next Friend of
Sarah Doe,

                              Plaintiff-Appellee,

                    versus

RAINS COUNTY INDEPENDENT SCHOOL DISTRICT,
ET AL.,

                              Defendants,

DANA WHITE,

                              Defendant-Appellant.

---

Appeal from the United States District Court
for the Eastern District of Texas

---

(October 3, 1995)

Before REYNALDO G. GARZA, KING, and HIGGINBOTHAM, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

     This appeal arises from yet another tragic instance of a high
school coach's alleged sexual abuse of a student.  It brings a
difficult issue testing limits of federal judicial authority:
whether a school teacher's breach of a state-law duty to report
child abuse can, by itself, give rise to a federal claim against
the teacher under 42 U.S.C. § 1983.  The parents of Sarah Doe
allege that Dana White, a school teacher, caused Sarah to be
deprived of rights protected under state law and the federal
constitution when White failed to report her discovery of Sarah's

sexual abuse within forty-eight hours as required by Texas law. See Tex. Fam. Code Ann. § 34.01-34.02. White appeals from the district court's denial of her motion for summary judgment, in which she asserted qualified immunity. We do not reach the issue of qualified immunity. We conclude that because White's breach of her duty under Texas law to report child abuse was not under color of state law, the Does failed to state a claim under § 1983 against White. We reverse and order dismissal of the suit against White.

I.

A.

The Does argue that the sole issue before us is the district court's denial of White's motion for summary judgment on qualified immunity grounds, and that we therefore lack authority to review the ruling below that the Does have stated a claim against White. This argument is without merit. When reviewing a district court's rejection of a defendant's assertion of qualified immunity, we start by asking whether plaintiffs have alleged a violation of a clearly established constitutional right. Blackwell v. Barton, 34 F.3d 298, 301 (5th Cir. 1994). Thus, before reaching the qualified immunity question, we "first resolve the constitutional question -- that is, whether [plaintiffs have] stated a claim for a violation of a right secured to [them] under the United States Constitution." Duckett v. City of Cedar Park, 950 F.2d 272, 278 (5th Cir. 1992) (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)). In deciding

2

whether the Does have stated a claim against White, we accept as true the facts as alleged by the Does.

B.

In September 1990, David Siepert resigned from his teaching and coaching position with the Lake Dallas Independent School District, amid allegations that he was sexually involved with a student of his who had been babysitting for him. In August 1991, with the help of Arthur Talkington, a former Lake Dallas colleague who was employed with RISD, Siepert obtained a coaching position at Rains High School in RISD. From the start of his employment with RISD, Siepert developed a reputation for acting inappropriately toward female students. Reports of his misbehavior indicated, for example, that Siepert summoned female students from class early to wrap ankles or wrists for athletics, talked in front of students about dating high school students, and massaged a female student while alone with her in the gym.

During the fall of 1991, while fifteen-year-old Sarah Doe was a student in Siepert's physical education class, Siepert contacted Sarah at school about babysitting for him. Not long after Sarah began babysitting for Siepert's two children, Siepert began making sexual advances toward her. Siepert eventually began having sexual intercourse with Sarah on a regular basis throughout the 1991-1992 school year, typically at his home while Sarah was "babysitting."[1] Siepert, though, did not limit his interaction with Sarah to his

---

[1]Siepert has denied the allegations that he engaged in any misconduct of a sexual nature with Sarah.

home. He often discussed babysitting arrangements with Sarah at school, drove Sarah from school to his home when she was scheduled to babysit, and gave gifts to her while in his car or at school. In addition, Siepert had physical contact with Sarah during his physical education class; for example, he would request Sarah's assistance in putting away athletic equipment, then grab her hands and buttocks while they were alone in the equipment room. Although this in-school contact ended with the arrival of summer vacation, Siepert's requests for babysitting assistance did not.

Dana White entered the scene during the summer of 1992. White was employed as a junior high school teacher with RISD from August 1982 until June 1993, during which time she was certified as a teacher in Texas and paid monthly pursuant to her teaching contract with RISD. On June 22, 1992, White found out that Siepert was having sexual relations with Sarah. On that date, Sarah called White from Siepert's home, where Sarah was babysitting, to ask for advice about a condom leak. White suspected that Sarah might be having problems of a sexual nature with the adult for whom she was babysitting, but did not know his identity until Sarah indicated that she was babysitting for Siepert. White immediately went to Siepert's home to talk with Sarah in person, at which time Sarah revealed the details of her ongoing sexual affair with Siepert. White chose not to report Siepert's abuse of Sarah at that time.[2]

---

[2]White insists that she remained silent to honor her promise of confidentiality to Sarah, which Sarah demanded before revealing Siepert's identity, and also because White believed that Sarah was not in immediate danger since Siepert was out of town. Although White's reasons for not reporting the abuse are not in the Does'

Although Sarah made efforts to terminate her involvement with Siepert, she continued to babysit for him intermittently throughout the summer and into the fall of 1992. On November 5, 1992, Sarah visited White's classroom to complain about her frustration with Siepert. Sarah told White that Siepert had been making Sarah feel guilty about turning down babysitting assignments, and that he had told Sarah that he was interested in dating her. White discussed Sarah's problem with her brother, her husband, and an attorney, but she again declined to report the abuse to the proper authorities. From November 5 through November 12, 1992, White and other school teachers and officials had various conversations regarding Sarah's abuse; however, a proper report was not made until November 12.[3]

Jane and John Doe brought this civil rights suit asserting state and federal claims on behalf of Sarah against Siepert, White, RISD, and certain other RISD teachers and officials. The Does allege that the defendants violated, inter alia, the Due Process Clause of the Fourteenth Amendment by causing Sarah to be deprived of her liberty interest in bodily integrity. The Does sued White in her individual and official capacities, asserting that White, by exhibiting deliberate indifference to Sarah's constitutional rights

alleged facts and thus not relevant to our disposition, we mention them to facilitate a better understanding of the supposed circumstances of White's inaction.

[3]On that date, White accompanied Sarah to Sarah's home, where Sarah told her parents about her involvement with Siepert. While there are conflicting indications as to what happened immediately thereafter, there is no dispute that White subsequently went to the local sheriff's office to file a report that included a discussion of Sarah's sexual involvement with Siepert.

5

in breaching her duty under Texas law to report Sarah's abuse, caused Sarah's deprivation under color of state law. White moved for summary judgment, arguing that the Does had failed to state a claim against her in her official capacity, and that she was entitled to qualified immunity in her individual capacity. The district court granted summary judgment for White in her official capacity, but denied her motion as to her individual capacity. White appeals this denial of summary judgment on her qualified immunity claim, asserting that the Does have failed to state a § 1983 claim against her, and that in any event she is entitled to qualified immunity.

## II.

### A.

To state a claim under § 1983, plaintiffs must allege two elements: first, that they were deprived of a right or interest secured by the Constitution and laws of the United States, and second, that the deprivation occurred color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988).[4] Where an asserted interest is protected by a constitutional provision that operates only against

---

[4]§ 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

the State, such as those of the Fourteenth Amendment, plaintiffs must also allege state action to satisfy the first step of alleging an actionable deprivation. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 930 (1982). Hence, to allege a violation of the Due Process Clause of the Fourteenth Amendment, the under color of state law requirement of § 1983 is usually overlapped by an allegation of state action made in asserting the constitutional violation. The Fourteenth Amendment's state action requirement may be nominally distinct from § 1983's under color of state law requirement, but the two inquiries are related; a showing of state action is sufficient to establish action under color of state law, id. at 935 & n.18, and "it is clear that in a § 1983 action brought against a state official, the statutory requirement of action `under color of state law' and the `state action' requirement of the Fourteenth Amendment are identical," id. at 929. Accordingly, in § 1983 suits alleging a violation of the Due Process Clause of the Fourteenth Amendment, we have collapsed the state action and color of state law inquiries into a single, second step: Plaintiffs must (1) assert a protected "liberty or property" interest and (2) show that they were deprived of that interest under color of state law. See Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 450 (5th Cir. 1993) (en banc), cert. denied, Lankford v. Doe, 115 S. Ct. 70 (1994).

In light of our recent decision in Doe v. Taylor, we have little trouble concluding that the Does' allegations are sufficient to establish that Sarah suffered an actionable deprivation of her

liberty interest in freedom from sexual abuse by persons wielding state authority.  In Doe v. Taylor, we held that "schoolchildren do have a liberty interest in their bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment and that physical sexual abuse by a school employee violates that right." 15 F.3d at 445.  The factual predicate of Doe v. Taylor painted an unfortunate picture of sexual exploitation that is similar to what allegedly transpired in this case:  A high school coach who had a reputation for behaving inappropriately toward female students developed a sexual interest in a fifteen-year-old student in his biology class.  Using his state power and status, the coach manipulated the student, pursuing her during school hours and on school grounds -- for example, by writing suggestive notes on her homework and exams, showing her favoritism in class, and buying alcoholic beverages for her and her friends during lunch, eventually having sexual intercourse with her on repeated occasions.  We concluded that he had acted under color of state law in sexually abusing the student, finding that "a `real nexus' exist[ed] between the activity out of which the violation occur[ed] and the teacher's duties and obligations as a teacher." Id. at 452 n.4.

Doe v. Taylor persuades us that the Does have stated a § 1983 claim against Siepert for depriving Sarah of her federal constitutional right to bodily integrity.  Sarah was a student in Siepert's class, and Siepert had considerable interaction with Sarah at school:  He allegedly discussed babysitting arrangements

8

with her, gave her rides from school, delivered personal notes to her, and gave gifts to her. Particularly since White herself concedes in her brief that Siepert can be held liable under § 1983 for Sarah's injury, we find it appropriate to assume, for purposes of this appeal, that the Does have adequately alleged that Siepert acted under color of state law in causing Doe to be deprived of her liberty interest in bodily integrity. It is true that this reach of a constitutionally secured interest in personal liberty is fairly debatable as an original proposition. We were persuaded in Doe v. Taylor that Supreme Court precedent has ended that precise debate for this, an inferior court.

B.

That a deprivation has occurred at the hands of a state actor, however, does not answer the separate question of which other persons, apart from the immediate perpetrator, may be held liable under § 1983. To help focus this inquiry, our decision in Bush v. Viterna, 795 F.2d 1203 (5th Cir. 1986), outlined a three-step approach for drawing the circle of liability in a § 1983 action. After finding that (1) a rights violation occurred (2) under color of state law, only then do we ask a third and final question: Who are the state actors responsible for the constitutional violation? Id. at 1209; see also Collins v. City of Harker Heights, 112 S. Ct. 1061, 1066 (1992) ("[P]roper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is

9

responsible for that violation.").  As we explained in <u>Bush</u>, this final question "will usually be answered exclusively by reference to state law and practice. . . .   The states have virtually complete freedom to decide who will be responsible for such tasks, and therewith to determine who will be held liable for civil rights violations that occur in the course of carrying them out."   795 F.2d at 1209.   Much as state law defines property interests, <u>see</u> <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 538 (1985), identifies which state officials have final policymaking authority, <u>see</u> <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 124-27 (1988), and determines whether a federal employee was acting within the scope of his employment, <u>see</u> <u>Garcia v. United States</u>, 62 F.3d 126, ___ (5th Cir. 1995) (en banc), state law in this context delineates the contours of federal liability by locating the persons who can be held responsible under § 1983 for causing a constitutional injury.

The Does allege that the Texas Family Code, by imposing on teachers an affirmative duty to report child abuse in a timely manner, has encircled White as a state actor who can be held liable under § 1983 for Sarah's deprivation.   The Family Code provides generally that "[a]ny person having cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse or neglect shall report in accordance with Section 34.02 of this code."   Tex. Fam. Code Ann. § 34.01.   While Subsections (a) and (b) of § 34.02 prescribe the requisite method

10

and content for a proper report, § 34.02(d) establishes a more stringent reporting requirement for "professionals":

> If a professional has cause to believe that a child has been or may be abused or neglected, the professional shall make an oral report as prescribed by Subsection (a) of this section not later than the 48th hour after the hour the professional first suspects that the child has been or may be abused or neglected. . . . In this subsection, "professional" means an individual who is licensed or certified by the state, or who is an employee of a facility licensed, certified, or operated by the state, and who in the normal course of official duties, or duties for which a license or certification is required, has direct contact with children. "Professional" includes teachers, nurses, doctors, and day-care employees.

Hence, since a knowing failure to report in accordance with the applicable requirements is punishable as a misdemeanor, see Tex. Fam. Code Ann. § 34.07, the Family Code imposes on all teachers a criminally enforceable obligation to report child abuse within forty-eight hours of acquiring suspicion or knowledge of the abuse.

The Does argue that a teacher who waits longer than forty-eight hours to report state-occasioned child abuse subjects herself to liability under § 1983 if she was deliberately indifferent to the constitutional rights of the abused child. In particular, the Does rely on our holding in Doe v. Taylor that, where supervisory school officials were deliberately indifferent to a subordinate teacher's sexual abuse of a grade-school student, the officials can be held responsible for the resulting deprivation of the student's constitutional rights. See 15 F.3d at 452-54. While acknowledging that White was not a supervisory official, the Does suggest that our reasoning in Doe v. Taylor should be extended to this case, emphasizing the following passage from the concurring opinion:

11

"State law allows us `to identify the persons responsible for [the] identified civil rights violation.' . . . To put the matter differently, state law guides us in circling state actors who fairly can be said to have caused Doe to be subjected to the rights violation." Id. at 463 (Higginbotham, J., concurring). The district court agreed with the Does, relying on this passage in concluding that the Does had stated a § 1983 claim against White for causing Sarah's constitutional deprivation.

White does not dispute that she breached her duty under Texas law by not reporting Sarah's abuse more promptly. Instead, she argues that her breach, standing alone, cannot give rise to a federal claim against her. Thus, White offers a contrary reading of Doe v. Taylor, pointing to a different statement in the concurrence: "Consider a classroom teacher in the same school as Coach Stroud who had full knowledge of Coach Stroud's activities but looked the other way. Any moral duty aside, no one suggests that § 1983 imposes liability upon this silent teacher." Id. at 464 (Higginbotham, J., concurring).

As the Does have pointed out, however, White omitted a key sentence that immediately follows her quoted segment: "This conclusion is found in the role of state law." Id. The Does thus argue that here, unlike Doe v. Taylor, state law does impose an affirmative duty on a fellow teacher not to remain silent, and that White's breach of that duty therefore can serve as the basis for § 1983 liability. Hence, the precise question for this court is whether state law supports the conclusion that White's breach of

12

her state-law duty to report child abuse renders her responsible for Sarah's constitutional injury at the hands of Siepert.

## C.

The Does arguments, though logically enticing, are ultimately incomplete.  As we explained in <u>Bush</u>, it is often difficult, but nevertheless essential, to "isolat[e] the appropriate inquiry into the identity of the state actors responsible for the violations from the <u>separate question</u> of whether particular defendants had breached some duty imposed on them by state law."  795 F.2d at 1209 (emphasis added).  While the state may levy responsibility for constitutional injuries through imposition of state-law duties, it does not follow that every person who violates state law is amenable to a federal claim.  A state employee's breach of a duty does not by itself establish her liability under § 1983; rather, asking whether a breach of a state-law duty resulted in a constitutional injury is a vehicle for answering the critical question:  whether state law has reposed in a defendant enough responsibility for the underlying conduct that she can be said to have caused the injury herself.  The state allocates responsibility under state law, but it is a <u>federal</u> decision as to whether its assignments of duties and authority create action under color of state law.  A state employee's breach of a state-law duty to act can give rise to § 1983 liability, but only if, as a matter of federal law, the duty is of such nature as to render her responsible for the constitutional harm when breached.

13

It is important to keep in mind that we are not asking whether breach of a state-law duty constitutes a distinct constitutional violation. Since the Does have already asserted an actionable constitutional deprivation based on Siepert's abusive conduct, the precise question remaining is whether there are persons in addition to Siepert whose responsibility under state law is sufficient to subject them to liability under § 1983 for that single deprivation -- persons who, in the legal sense, are the participants. By supplying the requisite elements of a § 1983 claim -- i.e., a constitutional deprivation, causation, and action under color of state law -- Siepert's alleged misconduct frees us to redirect our focus away from the requirements for a constitutional claim, which Siepert has met, and toward the lines of responsibility under state law. In short, once we determine that a constitutional violation has occurred, we are no longer barred from finding another person liable under § 1983 for committing a state-law breach that caused the constitutional injury, even if the breach itself does not independently satisfy the elements of a constitutional claim.

Taken to its extreme, such reliance on state law could allow states virtually unfettered latitude in prescribing the scope of federal liability. Subject only to due process limitations, a state conceivably could declare a person responsible for someone else's unconstitutional conduct, through creation of state-law duties, no matter how attenuated the person's relationship to the injurious conduct and regardless of whether the person otherwise had any affiliation with the state. But since the effect of state

14

law in defining federal liability is ultimately an issue of federal law, and given our role in shaping federal law, we have seen fit to avoid such an outcome through interpretation of the elements of federal constitutional and statutory claims asserted via § 1983.

The Supreme Court has emphasized that "the Due Process Clause `does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society.'" Collins, 112 S. Ct. at 1070 (finding no federal constitutional obligation to provide state employees with minimum levels of workplace safety and security) (quoting Daniels v. Williams, 474 U.S. 327, 332 (1986)); see also Bush, 795 F.2d at 1209 ("[T]he enforcement of state law is the job of the states, and the federal civil rights statute may not be used to bootstrap alleged violations of state law into federal claims."). Mindful of its role in preserving the distinction between state law torts and constitutional violations, the federal judiciary has fashioned certain limiting principles designed to cabin the ability of state law to render persons liable under § 1983 for causing a constitutional injury. A municipality, for instance, cannot be held vicariously liable under § 1983; rather, plaintiffs must point to an official policy or custom that was the "moving force" of a constitutional injury. Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 694 (1978). Further, injuries resulting from a municipality's failure to train or to supervise its employees can give rise to § 1983 liability only where the inaction is indicative of an official policy or custom that manifests deliberate

indifference toward the rights of the injured persons.  See City of Canton v. Harris, 489 U.S. 378, 388 (1989).  Monell's moving force requirement for claims of failure to train means that "the identified deficiency in a city's training program must be closely related to the ultimate injury."  City of Canton, 489 U.S. at 391. Stated another way, "[t]here must at least be an affirmative link between the training inadequacies alleged, and the particular constitutional violation at issue."  Oklahoma City v. Tuttle, 471 U.S. 808, 824 n.8 (1985).

As the Court has explained, "permitting cases against cities for their `failure to train' employees to go forward under § 1983 on a lesser standard of fault would result in de facto respondeat superior liability on municipalities -- a result we rejected in Monell."  City of Canton, 489 U.S. at 392.  Significantly, though, the refusal to impose vicarious liability, the requirement of an official policy or custom, the deliberate indifference standard, and the moving force test are not mandated by the language of either the Constitution or § 1983.  Rather, they are limiting principles that federal courts have fashioned in the course of drawing the line between liability under state-law obligations and § 1983.  The force of this distinction is exemplified by our holding that vicarious liability can never be the basis for a § 1983 claim, even where state law provides that a supervisor is vicariously liable for the conduct of his subordinates.  See Baskin v. Parker, 602 F.2d 1205, 1208 (5th Cir. 1979) (relying on Monell). We, as federal courts, have chosen to supply certain glosses in our

16

construction of § 1983 to bring into focus the difference between a state-law breach and a constitutional violation. In other words, in asking the federal-law question whether a state-law duty imposed responsibility under § 1983 for another person's constitutional wrong, we have chosen to say that not all state law obligations are of such nature that a person's breach subjects that person to federal liability. We have chosen to demand a heightened showing of fault and causation before concluding that breach of a duty to act renders a supervisory state official or a municipality liable under § 1983.

That a supervisory school official may be held liable under § 1983 for breaching his state-law duty to stop or prevent child abuse thus does not compel the conclusion that a nonsupervisory teacher is responsible for breaching a state-law duty to report the abuse. Instead, this conclusion depends on a relative analysis of state law's treatment of supervisors and teachers. We must ask what it is about a supervisor's duties and functions that renders a state supervisory official liable for a constitutional deprivation by a subordinate. Only when we learn this can we decide whether, despite her lack of supervisory powers, a teacher who breaches her duty to report child abuse nevertheless engages in conduct akin to that of a supervisor who flouts his responsibility to supervise. By focusing on the core elements of supervisory liability, we can avoid the "risk of applying state law rather than simply using state law to identify the persons responsible for an identified civil rights violation." Bush, 795 F.2d 1209.

17

## III.

The Does' reliance on our analysis of supervisory liability in Doe v. Taylor begs a critical element of this final step in our Bush inquiry:  Was White acting under color of state law when she breached this duty?  Color of state law in this context does not implicate the state action requirement of the Fourteenth Amendment because we are not asking whether White is guilty of committing an independent constitutional violation.  Rather, since the Does seek to hold White liable for damages under § 1983, the key question is whether she has met the statutory requirements of a § 1983 claim -- whether she fairly can be said to have acted under color of state law in causing Sarah's constitutional injury.  As the Supreme Court has explained, even where state action is not necessary to state a claim under § 1983, the color of state law requirement of § 1983 still maintains its vitality as a statutory element:

> [A]lthough . . . the under-color-of-state-law requirement does not add anything not already included within the state-action requirement of the Fourteenth Amendment, § 1983 is applicable to other constitutional provisions and statutory provisions that contain no state-action requirement.  Where such a federal right is at issue, the statutory concept of action under color of state law would be a distinct element of the case not satisfied implicitly by a finding of a violation of the particular federal right.

Lugar, 457 U.S. at 935 n.18.

While this case does not involve a federal right apart from the Does' Fourteenth Amendment substantive due process claim, the Court's analysis is nevertheless instructive as to the "distinct" nature of the statutory requirement of "action under color of state law."  That is, as Siepert's alleged sexual misconduct has already

18

supplied the requisite state action for purposes of asserting a Fourteenth Amendment violation, we need not ask about Fourteenth Amendment state action in focusing on the Does' § 1983 claim against White. But since we do have to ask whether White has met the statutory requirement of action under color of state law, our inquiry into White's liability under § 1983 is analytically similar to a § 1983 claim in which a claimant asserts the violation of a federal provision that does not contain a state action requirement. Thus, in asking whether White is liable under § 1983 for causing Sarah's deprivation by Siepert, we must determine whether it fairly can be said that White's breach of her state-law duty to report child abuse was action under color of state law, for only then can we find that the Does have satisfied the elements of a § 1983 claim against White.

As we will explain, "color of state law" demands a causal connection between the state-law breach and the constitutional injury, and satisfaction of this causation requirement in turn hinges on the presence of a right of legal control over the events culminating in the constitutional harm. Thus, while state law guides us in locating the constitutional actors responsible for causing a constitutional injury, we are still constrained in drawing the circle of federal liability; we must be satisfied that White's failure to report Sarah's abuse within forty-eight hours had the requisite causal relationship to Sarah's constitutional wrong. Simply put, White is responsible under § 1983 for breaching

19

her duty to report Siepert's abuse of Sarah only if state law also empowered her with a right of legal control over Siepert.

## A.

While state law imposes a panoply of legally enforceable obligations on both citizens and state employees, not every law creating a duty establishes that the obligated party is a state actor for purposes of fulfilling the duty. "A State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes. But not `all common-law duties owed by government actors were . . . constitutionalized by the Fourteenth Amendment.'" DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 202 (1989) (quoting Daniels v. Williams, 474 U.S. at 335). Many jurisdictions, for example, have recognized misprision of felony as a common law offense, criminalizing a failure to report known commission of a felony, see 21 Am. Jur. 2d § 34, yet it has never been suggested that a person becomes a state actor solely by committing this offense. If imposition of a duty on a person by itself cloaked that person with state authority such that breach entailed an exercise of state power, then every citizen would act under color of state law and face federal liability when breaching virtually any state-law obligation. As such an outcome is untenable, a threshold question when dealing with any § 1983 action based on a breach of an affirmative duty is whether the alleged failure to act can be said to constitute action under color of state law.

Liability attaches under § 1983 only where a defendant, acting under color of state law, causes a person to be deprived of a federally secured right or interest. This requirement that action be under color of state law is as essential as it is rigorous; a person does not act under color of state law solely by virtue of her relationship to the state, but depending on her function -- i.e., the nature of her challenged conduct. See Polk County v. Dodson, 454 U.S. 312, 319-20 (1981) (holding that public defender does not act under color of state law when defending clients); see also Daniels v. Williams, 474 U.S. at 335-36 (emphasizing that claim based on Fourteenth Amendment does not transform every tort committed by state official or employee into constitutional violation); Screws v. United States, 325 U.S. 91, 111 (1945) (noting that acts of state officer in ambit of personal pursuits are not acts under color of state law). Regardless of one's affiliation with the state, "a person acts under color of state law only when exercising power `possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" Polk County, 454 U.S. at 317-18 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)). Hence, to determine which state-law duties are such that a breach is under color of state law from, we focus on the nature of the duty, not the status of the person. We ask whether a particular duty is of such a nature that breach by a defendant represents a misuse of state authority -- i.e., whether the failure to act in accordance

with the state-law duty entailed an exercise of power made possible only because the defendant was clothed with the authority of law.

Where the alleged official misconduct involves a breach of an affirmative duty to act, a two-party conceptual complexity arises from the fact that the act complained of is (1) unlawful, and (2) an act of omission, rather than commission. Ordinarily, the unlawfulness of official conduct does not preclude us from finding that the conduct was nevertheless action under color of state law. Thus, where a state official acted under a grant of authority by the state, she can be held liable under § 1983 for unlawful conduct on the ground that she exceeded her authority. See, e.g., Monroe v. Pape, 365 U.S. 167, 170-87 (1961), overruled in part on other grounds, Monell, 436 U.S. at 690-701.

This analysis cannot be easily extended, however, when the issue is a breach of an affirmative duty to act. In particular, the conceptual difficulty is in deciding when it can be said that there was a conferral of state authority making it possible for a defendant to wield state power in failing to act. Thus, when deciding whether the defendant exercised state power, the first question is, necessarily, whether the defendant possessed any state power to begin with -- i.e., whether she was clothed with state authority with respect to her duty to act. This inquiry, in turn, requires an examination of our cases in which § 1983 liability has

22

been based on a defendant's failure act, with a particular focus on the nature of the duty breached.[5]

B.

As we have held that state supervisors can be found liable under § 1983 for failing to comply with a state-law duty to act, we necessarily have determined that under certain circumstances, a guilty supervisor's inaction may constitute action under color of state law. If a supervisor acted under color of state law, then he must have possessed and exercised state power in failing to act and thereby causing the constitutional injury perpetrated by his subordinate. Accordingly, we start by reviewing our supervisory liability cases in an effort to distill the proper meaning of "under color of state law" as applied in the context of a defendant's inaction in the face of a duty to act.

In Sims v. Adams, 537 F.2d 829 (5th Cir. 1976), we explained that "§ 1983 requires a degree of causation as an element of individual liability, but it does not specifically require `personal participation.'" Id. at 831. Where personal participation is absent, "a supervisory defendant is [still] subject to § 1983 liability when he breaches a duty imposed by state or local law, and this breach causes plaintiff's

---

[5]We are mindful of the Supreme Court's ruling in Collins that § 1983 does not require "proof of an abuse of governmental power separate and apart from the proof of a constitutional violation." 112 S. Ct. at 1065. Here, plaintiffs have already alleged a constitutional violation; we ask whether there is an exercise of authority only in answering the separate question of which other persons can be held liable under § 1983 for causing the alleged deprivation.

23

constitutional injury."  Id.  Thus, the plaintiff in Sims stated a claim against defendants who "allegedly breached the duties of a mayor and a chief of police to control a policeman's known propensity for improper use of force."  Id. at 832.

Following the Supreme Court's decision in Monell, we held that a supervisory official could not be held vicariously liable under § 1983 for the misconduct of a subordinate, even where state law did impose vicarious liability on the supervisor.  See Baskin v. Parker, 602 F.2d at 1208.  We did not retreat, however, from the rule that a state supervisor's breach of a state-law duty can give rise to direct liability under § 1983.  We established a three-part test for determining when a supervisory official can be held liable for the conduct of a subordinate:  "the plaintiff must show that: (1) the [supervisor] failed to supervise or train the [subordinate], (2) a causal connection existed between the failure to supervise or train and the violation of the plaintiff's rights, and (3) such failure to supervise or train amounted to gross negligence or deliberate indifference."  Hinshaw v. Doffer, 785 F.2d 1260, 1263 (5th Cir. 1986); see also Bowen v. Watkins, 669 F.2d 979, 988 (5th Cir. 1982); Douthit v. Jones, 641 F.2d 345, 346-47 (5th Cir. 1981); Barksdale v. King, 699 F.2d 744, 746-48 (5th Cir. 1983).

With this precedent in hand, we concluded in Doe v. Taylor that supervisory school officials can be held liable under § 1983 for a subordinate teacher's sexual abuse of an elementary or secondary school student.  15 F.3d at 452-54.  Relying on the

24

Supreme Court's analysis in City of Canton, we held that "a school official's liability arises only at the point when the student shows that the official, by action or inaction, demonstrates a deliberate indifference to his or her constitutional rights." Doe v. Taylor, 15 F.3d at 454. We adopted a three-step test in cases involving alleged sexual abuse of a grade-school student: Where a supervisory school official (1) knew facts "pointing plainly toward the conclusion that the subordinate was sexually abusing the student," (2) demonstrated deliberate indifference toward the student's constitutional rights by failing to take appropriate action to prevent or stop the abuse, the official can be held personally liable to the student if (3) the official's failure to act caused a constitutional injury to the student. Id.

Although these cases did not discuss how an official who breached a state-law duty to act could be said to have been acting under color of state law, it is not difficult to see that they possessed state authority. State law imposes duties on supervisory officials while entrusting them with power to assure compliance with constitutional standards, typically by exercising direct control over subordinates. Failure to exercise control, if accompanied by the requisite level of indifference, may give rise to § 1983 liability. See, e.g., Sims, 537 F.2d at 832 (breach of "duties of a mayor and a chief of police to control a policeman's known propensity for improper use of force"); Bowen, 669 F.2d at 988 (failure to supervise in face of history of widespread abuse); Hinshaw, 785 F.2d at 1264 & n.1 (failure "to control an officer's

25

known propensity for the improper use of force"); <u>Doe v. Taylor</u>, 15 F.3d at 454 (failure to supervise or control sexually wayward coach). Thus, where a supervisory official breached a state-law duty with deliberate indifference toward a resulting constitutional injury, he misused the state authority conferred on him to supervise and control his subordinates. The supervisor's failure to act, coupled with his deliberate indifference, was tantamount to a conscious decision to allow the alleged constitutional injury to occur or persist. <u>See, e.g.</u>, <u>Doe v. Taylor</u>, 15 F.3d at 463 ("An omission that evinces deliberate indifference toward the violation of an individual's constitutional rights may amount to an act that causes the violation.") (Higginbotham, J., concurring); <u>cf.</u> <u>City of Canton</u>, 489 U.S. at 389 ("`[M]unicipal liability under § 1983 attaches where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers.") (quoting <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 483 (1986)). This conclusion obtains because the state official was responsible for preventing the constitutional injury; his failure to do so rendered him directly liable for the deprivation that his subordinate perpetrated. Such a supervisory official is liable under § 1983 not because he committed a distinct constitutional violation by breaching his duty to supervise, but because his failure to control his subordinate rendered him responsible for the resulting subordinate misconduct -- essentially, he was a legal participant.

We have never suggested, however, that only supervisors can be held liable for a failure to act that results in a constitutional injury. Rather, it is state law's grant of a right of legal control over the immediate perpetrator of an injury that establishes that a state supervisor possessed and exercised state authority. While supervisors frequently have a right of control by virtue of their status, control can exist in other ways.

Judge Rubin's opinion in Howard v. Fortenberry, 723 F.2d 1206 (5th Cir. 1984), is instructive. In Howard, two prisoners died after prison officers confined them to a so-called "hot box," which was intended to serve as a disciplinary measure for uncooperative prisoners. The plaintiffs brought claims against various officials, including the Director of the Department of Corrections and two "sanitarians" who had a statutory duty to inspect the prison. The basis for the suit against the Director was that he breached his duty to inspect the prisons or otherwise to delegate the task to subordinates. Despite his position as a "Director," which ordinarily would seem to connote that he held a supervisory position, we found that he "apparently ha[d] no authority to remedy any deficiencies he might observe, beyond reporting them to the Governor." Id. at 1212. Because we found no evidence supporting "a causal connection between the Director's failure to report a condition in the prison to the Governor and the failure of the prison Board of Governors to change that condition," id., we concluded that "the Director's dereliction, if any, did not have a

sufficient causal connection to the constitutional deprivation to establish liability under § 1983," id.

Our analysis of the sanitarians in Howard, however, compelled a different result. We noted that the sanitarians had "stated in their depositions that, if they had seen and inspected the cells, they would have forbidden their use immediately; their failure to inspect thus had a clear causal connection to the deaths of [the plaintiffs]." Id. at 1213. Thus, even though the sanitarians were not positioned as supervisors, they acknowledged that they had a right of control over the persons who committed the deprivation, in that they could have forbidden the prison officials from using the hot boxes. In other words, the sanitarians had legal authority to control the prison personnel with respect to their usage of the hot box, and therefore their failure to inspect, together with their corresponding failure to prevent the constitutional harm, was action under color of state law.

This element of legal control is not confined to cases in which a state employee breached a duty to exert control over another state employee. Rather, the existence of a legal right of control is the linchpin in all cases in which we have found § 1983 liability based on breach of a duty to act, even where private actors committed the injurious harm. Consider, for example, our decision in Lopez v. Houston Ind. School Dist., 817 F.2d 351 (5th Cir. 1987). In Lopez, we held that a school bus driver could be found liable under § 1983 for failing to protect a student on his bus from being pummeled by another student. Even though the other

student's action was not a constitutional tort, as the attacking student was a private actor, we found that the bus driver had caused a distinct constitutional injury. Observing that he "was entrusted with the care of students attending school under Texas' compulsory education statute," id. at 356, we concluded that "[h]is alleged failure to protect [the plaintiff] or to render emergency aid abuse[d] state power," id. State law, in making the bus driver responsible for the welfare of students on his bus, empowered him with a right of control over those students. Significantly, the driver locked the students in the bus and left them. Since he would have been authorized under state law to use force to break up the fight, we held that his failure to do so after closing off the victim's possible escape routes, if accompanied by the requisite level of indifference, amounted to a conscious choice -- under color of state law -- to allow the beating of the child to continue. See id. at 354-56.[6]

---

[6]Lopez is not to be understood as recognizing a "special relationship" between schoolchildren and the state giving rise to a generalized federal constitutional duty to protect children from harm on school buses. See Walton v. Alexander, 44 F.3d 1297, 1302-04 & n.4 (5th Cir. 1995) (en banc) (discussing contours of "special relationship" as emerging from DeShaney, Estelle v. Gamble, 429 U.S. 97 (1976), and Youngberg v. Romeo, 457 U.S. 407 (1982)). Under Lopez, a state employee may face § 1983 liability when he misuses his state-conferred position in physically restraining a child in such a manner that the employee's conduct is tantamount to participation in the child's beating or other such victimization. Indeed, as Judge Posner has explained, "[i]f the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir. 1982).

In sum, our cases indicate that a right of legal control over the persons or events giving rise to the injury complained of has existed in those instances in which we have necessarily found that breach of a state-law duty to act was action under color of state law. Hence, the question in this case is whether a failure to report, in the absence of an accompanying duty to exercise state-conferred legal control, can still be said to constitute action under color of state law that causes the unreported constitutional injury. Holding that White can be held liable under § 1983 for an alleged delay in reporting Sarah's sexual abuse, in the absence of a determination that she had a legal right of control over Siepert, would effectuate an unprecedented extension of federal liability. Our authority to allow such a result aside, it is inappropriate to do so unless we first conclude that the right of legal control is of no significance to the elements of § 1983 liability. We turn now to that question.

C.

A right of control, as noted by our analysis in Howard, speaks most apparently to the issue of causation; absent a right of control, we concluded that the causal connection between the failure to act and the ultimate injury was too speculative to support a finding of § 1983 liability. Indeed, we suggested in Bush that the requisite causation under § 1983 could never exist unless a defendant had a duty to correct the constitutional violation: "[A]ccepting for now the concept that the breach of a state-imposed duty can cause a constitutional tort, we hold that

30

the necessary causal relationship is absent when a state duty to regulate, monitor, inspect, or advise is not accompanied by an obligation to extirpate constitutionally substandard conditions or activities that may be encountered." 795 F.2d at 1208. Under this rule, even where a plaintiff might be able to demonstrate that compliance with a state-law duty would have been instrumental in preventing or stopping a constitutional harm, the stricter causal connection requirement of § 1983 may foreclose a federal claim against the noncomplying defendant.

We have cautioned, however, that causation under § 1983 is "not to be gauged by the standards of ordinary tort law." Gonzalez v. Ysleta Indep. Sch. Dist., 996 F.2d 745, 755 (5th Cir. 1993); (citing Martinez v. California, 444 U.S. 277, 285 (1980)). Indeed, this requirement of a causal connection in a § 1983 action often may have the practical effect of imposing a heightened standard of proximate cause. For example, in Martinez v. California, plaintiffs sued under § 1983 on behalf of a woman whose life was taken by a parolee five months after his release by a parole board. The Supreme Court concluded that, "[r]egardless of whether, as a matter of state tort law, the parole board could be said either to have had a `duty' to avoid harm to [the parolee's] victim or to have proximately caused her death," the board did not deprive the victim of her life within the meaning of the Fourteenth Amendment. Martinez, 444 U.S. at 285 (citing Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99 (1928)). The Court emphasized that "at least under the particular circumstances of this parole decision,

appellants' decedent's death [was] too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law. Although a § 1983 claim has been described as a `species of tort liability,' it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute." Id. (quoting Imbler v. Pachtman, 424 U.S. 409, 417 (1976)).

This causal connection requirement may take shape as a stricter test of factual causation, but it is a more nuanced inquiry, particularly in the context of a failure to act. In demanding that a failure to supervise or train must be "closely related" to the constitutional injury, see City of Canton, 489 U.S. at 391 -- and regardless of how this test is otherwise stated, see Oklahoma City v. Tuttle, 471 U.S. at 824 n.8 (indicating necessity of "affirmative link" between training inadequacies and constitutional violation); Polk County, 454 U.S. at 326 (noting that official policy must be "moving force" of constitutional violation) -- the ultimate inquiry is whether there is a connection between action taken under color of state law and the constitutional harm. Of course, that the challenged conduct was indeed action under color of state law -- that a separate nexus existed between the alleged inaction and an exercise of state authority -- is implicit in a finding that such a causal connection existed for purposes of § 1983 liability. See Doe v. Taylor, 15 F.3d at 452 ("[I]f a `real nexus' exists between the activity out of which the violation occurs and the teacher's duties and

32

obligations as a teacher, then the teacher's conduct is taken under color of state law.").

When a claimant shows that there is both conduct under color of state law and causation of the injury -- only then has he satisfied § 1983's requirement of <u>causation under color of state law</u>. Put another way, the under color of state law requirement cannot be separated from the question of a causal connection between state authority and an alleged constitutional injury; rather, the notion of such a causal relationship is impounded in § 1983's requirement of action under color of state law.

In the context of an alleged breach of a state-law duty to act, the causal connection becomes unsteady at the point of conduct unless there is a right of legal control over the persons or events giving rise to the injury. Absent such control, a person's ability to abate the harm is too speculative to support § 1983 liability. At the same time, lack of legal control calls into question whether there is an exercise of state authority in failing to act. A right of control is authority conferred on a defendant by the State, and failure to utilize it properly can be said to constitute action under color of state law because the state actor is empowered by state law to take action that ordinary citizens cannot. If state law has imposed a duty to report, investigate, monitor, or regulate without granting a duty to exercise state-conferred legal control over the underlying persons or events, there is no conduit through which an exercise of state power can be said to have caused the constitutional injury. Because we find that the existence of a

33

right of legal control is a compelling distinction in the question whether state law has located a person as a constitutional actor, we insist that a breach of a state-law duty to report cannot render a person liable under § 1983 as a responsible state actor unless that person also had a duty under state law to exercise state authority in controlling the events that produced the unreported injury.

## IV.

Based on our analysis of the Texas Family Code, we conclude that White's breach of her duty to report did not establish the requisite causal nexus between state authority and Sarah's injury and therefore was not action under color of state law. The Family Code imposes a general duty on all citizens to report child abuse to the proper authorities. To supplement this citizen-wide duty, the statute establishes a stricter reporting requirement for "professionals," defined to include teachers, doctors, day-care sitters, and other such persons who are licensed, certified, or employed by the state, and who have contact with children in the course of their official duties. See Tex. Fam. Code Ann. § 34.01-34.02. Yet despite the reference to state certification, licensing, or employment in identifying who bears the heightened reporting obligation, the statute nowhere distinguishes between public and private professionals. More important, since the statute does not empower either citizens or professionals with a right of control over the child abuser, a failure to report in the

34

proper manner does not have the causal connection necessary to implicate an exercise of state power made possible only because the silent party is clothed with state authority.

Two illustrations expose the folly of suggesting that this Texas statute locates citizens or professionals as state actors who can be held responsible for constitutional injuries committed by persons whom they fail to report. First, suppose that White, while vacationing in Daingerfield, Texas, had told a privately employed research physician, who had no daily contact with children, about Sarah's abuse. While this doctor would face state criminal penalties for waiting too long to report the abuse, it is difficult to see how the doctor, solely because she was licensed by the state to practice medicine, possessed and exercised state authority in not reporting the breach. Second, since the duty to report child abuse applies regardless of whether the abuser is a state actor or private citizen, a finding of § 1983 liability based on a teacher's failure to report would turn on the status of the abuser, not the teacher. Where a child abuser has no state affiliation, the abuse itself is not a constitutional injury; the child would have to allege a separate deprivation arising purely from the teacher's failure to report. Such a claim would be unavailing, however, unless we were to conclude that the teacher's breach of a duty was by itself a constitutional tort. Indeed, as we have explained, the presence of state-conferred legal control is necessary to the requisite link between the teacher as a state actor and the sexual abuse.

Even though the Family Code has not empowered White with control over Siepert, White still may be held liable under § 1983 for Sarah's injury if she otherwise possessed authority under state law -- e.g., as a teacher or a citizen -- to exercise control over Siepert actions. Such control need not have been labeled as "supervisory," but may have existed, for example, if she had legal power to prohibit Siepert from having contact with Sarah. Cf. Howard, 723 F.2d at 1213 (emphasizing that sanitarians could have prohibited prison officials from using unsafe hot boxes). In such a situation, White's failure to report Sarah's sexual abuse may be found to have caused Sarah's constitutional injury because of White's responsibility for Sarah's welfare and concomitant right to exercise control over Siepert.[7]

Based on our review of the Does' allegations, we find no basis for concluding that Sarah had sufficient control over Siepert to render her liable under § 1983 for his abuse of Sarah. The Does concede that White did not have supervisory authority over Siepert. Although White and Siepert both worked in the same school district, White was a junior high school teacher at a different school than Siepert; even though White and Siepert were at neighboring schools,

---

[7]Thus, a school supervisory official can be held liable for breaching his duty under the Family Code to report a subordinate's abuse of a grade school student. See Doe v. Taylor, 15 F.3d at 465 (Higginbotham, J., concurring). The federal cause of action arises not strictly from the official's breach of his duty to report, but because his inaction constitutes an injurious abdication of his separate responsibility to supervise and control his subordinates. In other words, a supervisory official's failure to report child abuse is simply one manifestation of his failure to take steps to prevent or eliminate injury to a student.

36

her nearby status did not give her any legal control over Siepert. Regardless of whether Sarah had a generalized duty under state law to intervene on Sarah's behalf, we find that White had no right of control over Siepert and hence conclude that she cannot be held responsible under § 1983 for causing Sarah's constitutional injury at the hands of Siepert.

In short, we conclude that a failure to report child abuse as required by Texas Fam. Code Ann. §§ 34.01-34.02 is not action under color of state law. Since state law has not otherwise empowered White with a right of control over Siepert, we conclude that her breach did not have the requisite causal connection to Sarah's constitutional injury, and that White's delay in reporting was not action under color of state law. White therefore cannot be held responsible under § 1983 for Siepert's sexual abuse of Sarah. Although White violated Texas law by breaching her duty to report Sarah's abuse within forty-eight hours, White's lack of control over Siepert means that she did not "exercise power `possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" Polk County, 454 U.S. at 317-18 (quoting Classic, 313 U.S. at 326). The decision of the district court denying White's motion for summary judgment is reversed, and this case is remanded with instructions to dismiss the § 1983 claim against White with prejudice, and to dismiss without prejudice the state claims against White over which the trial court had supplemental jurisdiction.

REVERSED and REMANDED.