Mary CALLIS, Plaintiff,

v.

Officer Michael K. SELLARS, The City of Houston, Sergeant Martin Fite, and Sergeant L.L. Shoemaker, Defendants.

Civ. A. No. H–94–4391.

United States District Court,
S.D. Texas,
Houston Division.

Sept. 5, 1996.

Ken E. Harper, Houston, TX, for plaintiff.

Robert Louis Cambrice, City of Houston Legal Dept., Richard H. Cobb, Houston, TX, for defendants.

## MEMORANDUM AND ORDER

ATLAS, District Judge.

Pending before the Court is the City of Houston's ("City") Motion for Summary Judgment [Doc. # 59] and Sergeant Martin Fite's ("Fite") and Sergeant L.L. Shoemaker's ("Shoemaker") Motion for Summary Judgment [Doc. # 60]. For the reasons discussed below, both these motions are GRANTED.

## I. *FACTUAL BACKGROUND*

Plaintiff alleges that, while driving her car on or about December 27, 1992, she was stopped by Sergeant Sellars, who allegedly told her that her vehicle's tags were not "looking right," and that she had four outstanding traffic warrants. Plaintiff's First Amended Complaint, at 3. Plaintiff further alleges that Sellars asked her if she would be home that evening, and could he later stop by to discuss the outstanding warrants. Sellars allegedly returned to Plaintiff's home at 1:00 a.m. on December 28, 1992 and, after repeatedly telling her that he did not want her to go to jail for the outstanding warrants, raped her.

Sellars allegedly continued sexually harassing Plaintiff until she discovered that she had no outstanding warrants for her arrest. In March 1993, Callis contacted the police and, in turn, the Internal Affairs Division of the Houston Police Department ("I.A.D."). Plaintiff requested that appropriate action be taken to stop the sexual assaults, and an I.A.D. investigation was commenced, led by Sergeant Shoemaker. Shoemaker allegedly persuaded Plaintiff that the only way to convict Sellars was to set up a meeting in which Sellars would make admissions while being taped by I.A.D. This meeting was arranged for the evening of March 31, 1993, prior to which Plaintiff was wired by I.A.D. officers so that her conversation with Sellars could be monitored.

Plaintiff states that she went to I.A.D. at 3:00 p.m. on March 31, 1993, to discuss her attempting to get Officer Sellars to come to her apartment and make statements which would prove his culpability. Plaintiff's Response to City's Motion, at 13. Plaintiff states that it was agreed that Sergeant Fite would go to her apartment at 7:00 p.m. that evening to place the appropriate monitoring devices in the apartment prior to going to the Southeast Command Station. *Id.* at 14. Sergeant Fite placed the wireless transmitters/microphones in the bedroom and the living room so that the I.A.D. officers could monitor her conversation with Sellars.

At approximately 11:00 p.m. on the evening of March 31, Plaintiff proceeded to the Southeast Command Station, where Sellars was working the night shift, and asked to speak with Sellars. Sellars appeared shortly thereafter, and Plaintiff told him that she had gotten a few more tickets, and asked him if he could help her out. Plaintiff alleges that Sellars told her that he could help her out with the tickets, although the transcription of this meeting suggests that Sellars was somewhat noncommittal.[1] Plaintiff further alleges that I.A.D. did not think that the taped meeting provided sufficient evidence to return criminal charges against Sellars and thus they proceeded with their plan to use Plaintiff as "bait" for further investigation, *i.e.*, to stand watch at Plaintiff's apartment in the event that Sellars decided to visit her that evening. Plaintiff avers that during her meeting at the Southeast Command Station with Sellars, Plaintiff suggested that he come by that night so they "could work out a deal like [they] did before." Although Plaintiff agreed to participate in this "sting" operation, she avers that she did so based on alleged assurances by Shoemaker and Fite that she would not be harmed and that no physical contact would be made by Sellars. Callis Affidavit, at 1, 4. Plaintiff's claims that she understood that Sellars would be arrested as soon as he arrived at her apartment. Callis stated in one part of her affidavit that she was told by Sergeant Shoemaker

---

1. *See* Plaintiff's Response to the City's Motion for Summary Judgment ("Plaintiff's Response to City's Motion"), Exh. 5 (Tape Transcription of March 31, 1993 conversation between Plaintiff and Sellars outside the Southeast Command Station).

at the 3:00 p.m. meeting on March 31, 1993, that "so long as he knocks on the door, [Sellars'] goose is cooked." Callis Affidavit, at 2. She stated that she "relied on what Sgt. Shoemaker had stated to [her] earlier, that all they actually needed was for Sgt. Sellars to knock on the door." *Id.* at 5.

This version of Plaintiff's description of the plan, however, is contradicted to some degree by her own affidavits and deposition testimony.

In anticipation of Sellars' visit, the inside of Plaintiff's home was wired and Officers Fite and Williams were hidden in Plaintiff's sons' bedroom to monitor—presumably inside the apartment—her conversation with Sellars, as well as to protect Plaintiff.

Sellars arrived at approximately 2:00 a.m. He conversed with Plaintiff in her living room "for a period of time." Callis Affidavit, at 4. Plaintiff further states in her affidavit that she and Sellars then proceeded into her bedroom, whereupon Sellars talked to her "for a long period of time."

Plaintiff alleges in her First Amended Complaint that it was agreed that Sellars would be arrested as soon as he entered her *bedroom.* Plaintiff's First Amended Complaint, ¶ 27. Plaintiff directs the Court to Shoemaker's investigation report to bolster this assertion. The report, however, does not contain the promised support. *See id* and Plaintiff's First Amended Complaint, Exh. B.[2]

Plaintiff stated elsewhere in her affidavit that she had been told to yell out for help, but had not been reminded to do so prior to

Sellars' arrival at her apartment in the early hours of April 1, 1993. Callis Affidavit, at 5 ("[Prior to Sellars' arrival,] I had not been reminded [that] to yell for help [was] my only means of saving myself.") *See also* Fite's and Shoemaker's Motion for Summary Judgment, Exh. F (Callis Affidavit, dated April 1, 1993), at 2 ("After leaving the police station, ... [w]e went over what I was supposed to do and the fact that sergeants would be in the apartment and if anything went wrong to just yell and they were right there").[3]

Once he was satisfied that no one was hiding in Plaintiff's closet, Sellars allegedly began "putting his hands on [her] and fondling [her]." "He did that for about thirty seconds [before Plaintiff] moved away." Sellars allegedly then got down on his knees and started licking and fondling her body.[4] According to Plaintiff, he then said, "When is the last time you had sex with a white boy? Do you want some dick?" Plaintiff concedes that she did not yell out, because she was scared of what would happen if Sellars got agitated.

"After what seemed like a long period of time," Callis Affidavit, at 4, Plaintiff heard a knock at her apartment door. She opened the door to admit Sergeant Shoemaker, who apparently had been monitoring events outside Plaintiff's apartment. Shoemaker entered the apartment, disarmed Sellars, and ordered him to proceed directly to Internal Affairs.

Plaintiff further alleges that, because the walls in her apartment are very thin, Fite and Williams should have been able to hear what was going on in her bedroom,[5] particu-

2. Defendants claim that Plaintiff had been instructed to yell out either "stop" or "don't" as a "bust signal" if Sellars made any advances toward her at the apartment. Shoemaker Deposition, at 85; Williams Deposition, at 28, 30, 58.

3. Plaintiff elsewhere inconstantly maintains that, at the 3:00 p.m. meeting on March 31, 1993, I.A.D. never told her anything about a "bust" word. Callis Affidavit, at 2. The Court, however, relies on the Plaintiff's statements that are consistent with her pleadings and majority of her various statements.

4. Sellars admitted in his deposition that he reached underneath Plaintiff's tee shirt and touched her breasts. Sellars Deposition, at 116.

5. Plaintiff has submitted a transcription of the tape of the conversation during the "sting." *See* Plaintiff's Response to City's Motion, Exh. 6. In an affidavit submitted in support of Plaintiff's Response to Fite's and Shoemaker's Motion for Summary Judgment, Joseph Porto, a putative expert in civil rights violations by police officers, stated that, "although most of the transmission is inaudible, [one] can determine from the sounds that sexual acts are occurring and therefore the bust should have taken place." Porto Affidavit, at 2. An expert in audio and video equipment, W.J. Rockefeller, further testified that "[t]he tape was twelve minutes long ... It was evident that there were kissing sounds and sounds of contact of a sexual nature by a man and a woman." Rockefeller Affidavit, at 1.

larly in light of the fact that, according to Plaintiff, Sellars did not close the door when the pair entered Plaintiff's bedroom.[6] Sellars Deposition, at 122.[7] According to Plaintiff, Fite and Williams nonetheless failed to take action and allowed her to be sexually assaulted. Plaintiff estimates that Sellars was in her apartment for approximately fifteen minutes before Shoemaker came to her door.[8]

Plaintiff brings this suit pursuant to 42 U.S.C. §§ 1981 and 1983 and the Texas Tort Claims Act. In its Memorandum and Order dated February 27, 1996 [Doc. # 49], the Court dismissed all but two claims against the City and Officers Shoemaker and Fite: a state law claim against the City under the Tort Claims Act and a Fourteenth Amendment claim against Shoemaker and Fite for the alleged violation of Plaintiff's right to bodily integrity. Plaintiff was instructed to replead both claims with specificity.

## II. *SUMMARY JUDGMENT STANDARD*

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc); *Bozé v. Branstetter*, 912 F.2d 801, 804 (5th Cir.1990). The facts are to be reviewed with all inferences drawn in favor of the party opposing the motion. *Bozé*, 912 F.2d at 804 (citing *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986)). However, factual controversies are resolved in favor of the non-movant "only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.), *revised on other grounds upon denial of reh'g*, 70 F.3d 26 (1995).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. For any matter on which the non-movant carries the burden of proof at trial, however, the movant may, by merely pointing to the absence of evidence supporting the essential elements of the non-movant's case, shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact so as to warrant a trial. *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir.1995); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994).

The non-movant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the

---

**6.** Defendants maintain that, shortly after Plaintiff and Sellars went into her bedroom to talk, the bedroom door closed. Fite Deposition, at 43. At that point, Fite allegedly told Williams to contact the surveillance team outside and advise the officers in the van that Fite could not hear what was going on in Plaintiff's bedroom. *Id.* Williams was informed that the surveillance team could hear a conversation or some other sounds in Plaintiff's bedroom. *Id.* at 44. Fite then made the decision for the arrest team to move in, although Plaintiff had not yet given the "bust" signal. *Id.*

**7.** Sellars simply stated in his deposition that he thought that the bedroom door was open. Sellars Deposition, at 122.

**8.** Based on the tape of the events in Plaintiff's apartment, Plaintiff stated in her affidavit that from the time that Sellars arrived at her apartment to the time that the tape is no longer audible, a minimum of twelve minutes had elapsed. Plaintiff contends that, at the end of that twelve minute period, she was still in the bedroom with Sellars, and that another three minutes elapsed before there was a knock on the door and the proceedings came to a halt. Callis Affidavit, at 5. The I.A.D. officers involved in the "sting" contend that far less time passed between the time that Sellars entered Plaintiff's apartment and the time that Shoemaker entered and disarmed Sellars. Fite testified that the entire incident lasted no more than three and a half minutes, and that Plaintiff and Sellars were in her bedroom with the door closed for no more than two and a half minutes. Fite Deposition, at 45. Williams testified that the incident lasted from three to five minutes. Williams Deposition, at 64, 66, 70.

facts, or a scintilla of evidence. *Little*, 37 F.3d at 1075. In the absence of any proof, the Court will not assume that the non-movant could or would prove the necessary facts. *McCallum Highlands*, 66 F.3d at 92; *Little*, 37 F.3d at 1075 (citing *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990)). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Little*, 37 F.3d at 1075 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552).

## III. *DISCUSSION*

### A. *Federal Claims*

■ *Official Capacity Claim against Sellars.*—Plaintiff has sued Sellars under Section 1983 in both his individual and official capacities. The real party in interest in an official capacity suit is the governmental entity, and not the named official. *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 361–62, 116 L.Ed.2d 301 (1991). Consequently, the claim against Sellars in his official capacity is actually a claim against the City. In order to state a claim against a municipal defendant under Section 1983, Plaintiff must sufficiently plead the existence of a policy or custom which was the "moving force" behind the deprivation of her constitutional rights. *Monell v. Dep't of Social Servs. of City of N.Y.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978).

Plaintiff has failed to allege that the City has any custom, practice or policy of encouraging sexual misconduct on the part of its employees. Therefore, Plaintiff has failed to state an official capacity claim against Sellars

under Section 1983, and this claim against him in his official capacity must be dismissed.

*Individual Capacity Claims against Shoemaker and Fite.*—The only surviving claim against Shoemaker and Fite is for the alleged violation of Plaintiff's right to bodily integrity under the due process clause of the Fourteenth Amendment. Plaintiff alleges that Shoemaker and Fite failed to exercise "legal control" over Sellars during the "sting" and therefore violated her liberty interest in bodily integrity:

> [Shoemaker and Fite] exhibited a deliberate indifference to the Plaintiff's constitutional rights in breaching their duty as police officers under Texas law to prevent a crime from occurring in their presence and thereby causing the Plaintiff's deprivation of a liberty interest, *i.e.*, bodily integrity under color of state law ... Officer Fite and Officer Shoemaker were in control of the "sting" operation ... and were in control of Officer Sellars and could have placed him under arrest at any time.

Plaintiff's First Amended Complaint, at 23–24.

Plaintiff's bodily integrity claim appears to rely on a line of cases that was not decided until after a year or more after the "sting" operation occurred. *See Doe v. Rains County Indep. Sch. Dist.*, 66 F.3d 1402 (5th Cir. 1995) (finding Plaintiff's allegations sufficient to establish that she suffered an actionable deprivation of her liberty interest in freedom from sexual abuse by persons wielding state authority, but holding that named defendant was not such a person); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443 (5th Cir.) (en banc), *cert. denied*, 513 U.S. 815, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994) (holding that school children have a liberty interest in their bodily integrity that is protected by the due process clause of the Fourteenth Amendment and that sexual abuse by a school employee violates that right).[9]

9. Plaintiff appears to rely on language in *Doe v. Rains* which imputes liability under Section 1983 to state actors who fail to prevent the unconstitutional acts of those within their legal control:

> Failure to exercise control, if accompanied by the requisite level of indifference, may give rise to § 1983 liability ... We have never suggested, however, that only supervisors can be held liable for a failure to act that results in a

constitutional injury. Rather, it is state law's grant of a right of legal control over the immediate perpetrator of an injury that establishes that a state supervisor possessed and exercised state authority ... [L]egal control is not confined to cases in which a state employee breached a duty to exert control over another state employee. The existence of a legal right of control is the linchpin in all cases in which

■ The Court finds that Shoemaker and Fite are entitled to qualified immunity because the constitutional right which they allegedly violated was not clearly established when the "sting" operation took place in 1993. Qualified immunity shields government officials performing discretionary functions from liability for suits brought against them in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Gibson v. Rich,* 44 F.3d 274, 277 (5th Cir.1995).

In examining an official's claim of qualified immunity, courts follow a two-step process. The first step is to ascertain whether the plaintiff alleges "the violation of a clearly established constitutional right." *Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). The right the official is alleged to have violated must have been clearly established at the time of the occurrence. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Harper v. Harris County, Tex.,* 21 F.3d 597, 600 (5th Cir.1994). The second step is to decide whether the defendant's conduct was objectively reasonable in light of the legal rules clearly established at the time of the incident. *Gunaca v. State of Tex.,* 65

F.3d 467, 473–74 (5th Cir.1995); *Salas v. Carpenter,* 980 F.2d 299, 305 (5th Cir.1992).

■ Whether an official's conduct violated clearly established law, so as to preclude the application of qualified immunity, is essentially a legal question. *White v. Taylor,* 959 F.2d 539, 544 (5th Cir.1992) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985)).

Although the right to be free from state-occasioned damage to a person's bodily integrity was clearly established when Plaintiff's cause of action accrued, *see Shillingford v. Holmes,* 634 F.2d 263, 265 (5th Cir.1981), the notion that "legal participants" could be liable for the unconstitutional acts of those within their legal control was not clearly articulated until *Doe v. Rains* was decided in 1995.[10] Even today, the application of the doctrine of bodily integrity to voluntary civilian participants in a "sting" is an untrodden area of the law. Indeed, with the exception of *Shillingford,* Plaintiff cites the Court only to case law recognizing school children's constitutional right to be free from violations of their bodily integrity. Since the gloss on *Shillingford* supplied by the *Doe* cases was not rendered until after the events occurred of which Plaintiff complains, the Court finds that Plaintiff has failed to allege the violation of a constitutional right clearly established in 1993, and Shoemaker and Fite are entitled to qualified immunity.[11] Shoemaker's and

we have found § 1983 liability based on breach of a duty to act, even where private actors committed the injurious harm.
*Doe v. Rains,* 66 F.3d at 1413–14. Plaintiff argues that, as peace officers, Shoemaker and Fite had a duty under Texas law to prevent the commission of a crime in their presence. *See* Tex. Code Crim.Pro.Ann. art. 6.06 (Vernon Supp. 1995–1996) ("[whenever, in the presence of a peace officer, or within his view, one person is about to commit an offense against the person or property of another, ... it is his duty to prevent it ...").

10. In *Shillingford,* a city police officer who struck the plaintiff with a nightstick was sued under Section 1983 for violating the plaintiff's constitutional rights. Reversing the lower court, the Fifth Circuit found that physical abuse by police under color of state law may in some circumstances constitute a constitutional deprivation allowing recovery of damages under Section 1983. *Shillingford,* 634 F.2d at 265. While the Court recognized the right to be free of state-

occasioned damage to a person's bodily integrity, *id.,* because only the officer who injured the plaintiff was sued, the notion of "legal control" was not considered. The case at bar is distinguishable from *Shillingford* because neither Shoemaker nor Fite was an actual participant in Plaintiff's alleged assault.

11. The Court does not reach the question of whether the *Doe* cases create a cause of action under the circumstances of this case. However, even assuming that the constitutional right alleged by Plaintiff was clearly established in 1993, the Court is not convinced that Shoemaker and Fite were "legal participants" in the alleged abuse of Plaintiff. By her own admission, Plaintiff failed to yell out as agreed when Sellars allegedly began assaulting her. Therefore, even if the "sting" lasted fifteen minutes, as Plaintiff contends, Shoemaker and Fite had no way of knowing that anything had gone wrong, or that Plaintiff wanted the "sting" called off. The affidavits which Plaintiff submits alleging sounds of a sexual nature on the I.A.D. audiotape are over-

Fite's Motion for Summary Judgment is therefore granted.

## B. State Law Claims under Texas Law

*Intentional Torts Alleged Against Sellars.*—Plaintiff alleges the following intentional torts against Sellars: sexual harassment, sexual assault and battery, official oppression, and intentional infliction of emotional distress. Plaintiff's First Amended Complaint, ¶ 44. To the extent that these claims are alleged against Sellars personally, Plaintiff has stated a claim under Texas law for assault and battery and intentional infliction of emotional distress.

■ However, official oppression is a criminal offense rather than an intentional tort. *See* TEX.PENAL CODE ANN. § 39.03 (Vernon 1994).[12] Therefore, Plaintiff fails to state an actionable tort claim of official oppression under Texas common law.

As to Plaintiff's sexual harassment claim against Sellars individually, it is not self-evident that sexual harassment is a common law tort, as Plaintiff so readily assumes. Plaintiff has cited the Court to no case law on this issue, and the Court has unearthed only one decision which arguably characterizes sexual harassment as an intentional tort.

*See Graham v. Atlantic Richfield Co.,* 848 S.W.2d 747 (Tex.App.—Corpus Christi 1993, writ denied). *But see Hays v. Patton–Tully Transp. Co.,* 844 F.Supp. 1221, 1223 (W.D.Tenn.1993) (finding that sexual harassment has never been a common law tort but is a statutorily created cause of action). Although the Court doubts that Plaintiff states an actionable tort claim under Texas law, this claim will not be dismissed at this juncture, since Defendants have not sought such relief and the parties have not briefed the issue.

■ *Intentional Torts Alleged Against the City.*—To the extent that intentional torts are asserted by Plaintiff (assault and battery or intentional infliction of emotional distress) against the City pursuant to the Tort Claims Act, as such, they are outside the waiver of sovereign immunity provided for in the Act.[13] Therefore, Plaintiff has failed to state a claim against the City for Sellars' intentional torts, and the City's Motion for Summary Judgment is granted as to these claims.[14]

■ *Negligence Claim Against the City.*—In connection with the allegedly negligent performance of Sellars' duties, Plaintiff asserts a negligence claim against the City pursuant to the Texas Tort Claims Act.[15]

---

ly generalized and inconclusive; one cannot tell when, within the 15–minute time span, the matters occurred which Plaintiff argues should have provoked the officers' intercession. Because Plaintiff had been given no assurances as to the length of the "sting" (no one could predict how long it would take Sellars to make the incriminating statements needed to secure criminal charges or whether in fact he would make such statements), and because she failed to signal for help as apparently agreed and as logically was anticipated by the officers monitoring the "sting" events, the Court finds that Shoemaker's and Fite's conduct was not clearly unreasonable, even under Plaintiff's version of the facts.

12. Pursuant to Section 39.03, a public servant acting under color of his office or employment commits an offense if he (1) intentionally subjects another to mistreatment or to arrest, detention, search, seizure, dispossession, assessment, or lien that he knows is unlawful; (2) intentionally denies or impedes another in the exercise or enjoyment of any right, privilege, power, or immunity, knowing his conduct is unlawful; or (3) intentionally subjects another to sexual harassment. TEX.PENAL CODE ANN. § 39.03 (Vernon 1994).

An indictment of official oppression was returned against Sellars on April 19, 1993. (The version of the statute in effect when Sellars was indicted is virtually identical to that cited above. *See* TEX.PENAL CODE ANN. § 39.02 (Vernon Supp. 1992–1993)). Pursuant to a plea bargain agreement, the official oppression charge was dismissed and Sellars pled guilty to misdemeanor tampering. Sellars Deposition, at 133–34.

13. Under the Tort Claims Act, there has been no waiver of sovereign immunity with respect to claims "arising out of assault, battery, false imprisonment, or any other intentional tort." TEX. CIV.PRAC. & REM.CODE ANN. § 101.057 (Vernon 1986).

14. It does not appear from Plaintiff's complaint that she has alleged intentional torts against the City pursuant to the Tort Claims Act. However, the Court has addressed the argument because the City has addressed it in its motion for summary judgment.

15. The waiver of immunity provided for in the Texas Tort Claims Act provides as follows:

a governmental unit in the state is liable for:

Plaintiff's First Amended Complaint, at 17–18. Plaintiff argues that, as a result of Sellars' use or misuse of tangible personal property, i.e., his police badge, his uniform, his police vehicle, and his radio and computer, sovereign immunity is waived, and the City is therefore responsible for the damages allegedly caused by Sellars.

The Court finds this argument unpersuasive. Under Plaintiff's version of the facts, there is no suggestion that Sellars's conduct was in any way merely "negligent." Plaintiff's factual recitations demonstrate Sellars' premeditated and intentional sexual abuse and harassment of her. Her suggestion that Sellars' harassment was negligent is nonsensical. Therefore, the City's Motion for Summary Judgment is granted as to Plaintiff's Texas Tort Claims Act claim, which is dismissed with respect to Sellars.

*Texas Tort Claims Act Claims Against Shoemaker and Fite.*—Plaintiff argues that Sergeants Shoemaker and Fite, while acting within the course and scope of their employment as City of Houston police officers, were negligent in failing to prevent the sexual assault of Plaintiff during the course of the "sting."[16] Plaintiff alleges that Defendants used tangible personal property, i.e., hidden microphones, hidden tape transmitters, receivers, ear phones and other equipment, in failing properly to interpret and monitor the "sting." Plaintiff further alleges that this equipment was defective in that it did not adequately pick up the sounds in Plaintiff's bedroom. Finally, Plaintiff alleges that Shoemaker and Fite were negligent in failing to utilize video transmission equipment or other more sensitive audio transmission equipment.

The City's liability under the Tort Claims Act depends on the personal liability of Shoemaker and Fite. TEX.CIV.PRAC. & REM.CODE ANN. § 101.021 (Vernon 1986);[17] *Travis v. City of Mesquite,* 830 S.W.2d 94, 105 (Tex. 1992). The City argues that Shoemaker and Fite are entitled to official immunity for their alleged negligence during the "sting" and that, therefore, the City is not liable under the Tort Claims Act.

■ Government employees are entitled to official immunity from suit arising from the performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority. *City of Lancaster v. Chambers,* 883 S.W.2d 650, 653 (Tex.1994).

---

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission of the negligence of an employee acting within his scope of employment if:

(A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX.CIV.PRAC. & REM.CODE ANN. § 101.021 (Vernon 1986).

16. In her amended complaint, Plaintiff alleges Tort Claims Act claims against the City with respect to only Sellars, Shoemaker and Fite. However, in her Response to the City's Motion for Summary Judgment, Plaintiff belatedly argues that Sergeants Harrison and Salazar, the officers conducting surveillance in the van, also acted negligently in failing to prevent Plaintiff's alleged assault. The Court will not permit this backhanded amendment to the Complaint.

In any event, such a proposed amendment would be futile. Plaintiff's allegations with respect to Harrison and Salazar are only generalized argument, but Plaintiff seems to allege that these officers negligently monitored the audio equipment in the van during the "sting." Plaintiff cannot and does not allege that their actions were the proximate cause of her harm, which was, in fact, Sellars' alleged assault. Therefore, Plaintiff fails to state a claim against the City with respect to the actions of Harrison and Salazar, and an amendment to her complaint would be futile. *See Washington v. City of Houston,* 874 S.W.2d 791, 795 (Tex.App.—Texarkana 1994, no writ) (if a Tort Claims Act claim is based on the simple use of property—as opposed to its defective condition—an allegation that the injuries were proximately caused by the use of the property is required). Moreover, such allegations likely would fail in the face of official immunity arguments that these officers undoubtedly would advance. *See infra* at 801–03.

17. A governmental unit is liable for the negligence of an employee if "the employee would be personally liable to the claimant according to Texas law." TEX.CIV.PRAC. & REM.CODE ANN. § 101.021(1)(B) (Vernon 1986). *See supra* note 15 for the full text of this section.

Plaintiff concedes that Shoemaker and Fite were acting within the course and scope of their employment with the City of Houston when planning and executing the "sting." Plaintiff's First Amended Complaint, ¶ 53. Officer Holland, captain of I.A.D. at the time of the "sting," also testified that Shoemaker and Fite conducted their investigation of Sellars within the course and scope of their duties with I.A.D. City's Motion for Summary Judgment, Exh. D, E (Holland Affidavits).

■ The Court concludes that Shoemaker and Fite were performing discretionary functions when planning and implementing their investigation of Sellars. Discretionary acts require personal deliberation, decision, and judgment. *Aldridge v. De Los Santos,* 878 S.W.2d 288, 306 (Tex.App.—Corpus Christi 1994, writ dism'd w.o.j.). *See also Wyse v. Department of Pub. Safety,* 733 S.W.2d 224, 227 (Tex.App.—Waco 1986, writ ref'd n.r.e.) (finding that investigative activities constitute discretionary acts for purposes of governmental immunity). Both Shoemaker and Fite used their judgment and discretion in making decisions with respect to the investigation of Sellars. For example, Shoemaker used his discretion in deciding what evidence was necessary to secure criminal charges against Sellars. *See* Sellars Deposition, at 65. Similarly, Fite used his discretion in deciding what equipment would be suitable for monitoring events in Plaintiff's apartment on the night of the "sting" and where that equipment should be positioned. *See* Fite Deposition, at 34–35.

■ The City argues that these Defendants acted in good faith in planning and executing the "sting." An officer acts in good faith if a reasonably prudent officer, under the same or similar circumstances, could have believed that the conduct was reasonable. *Lancaster,* 883 S.W.2d at 656–57. "To controvert the officer's summary judgment proof on good faith, ... the plaintiff must show that 'no reasonable person in the defendants' position could have thought the facts were such that they justified defendant's acts.'" *Id.* at 657.

■ Plaintiff's Tort Claims Act claim is three-fold, and the Court will address each in turn with respect to Defendants' putative good faith. First, Plaintiff argues that, by negligently interpreting and monitoring the audio equipment, Shoemaker and Fite failed to prevent Plaintiff's alleged assault. This argument is unpersuasive as to Fite, who, while he may have been in radio contact with the surveillance van outside,[18] was clearly not privy to the audio transmission of the events in Plaintiff's bedroom.[19] Therefore, because his monitoring of the "sting" did not entail the use of tangible personal property (Fite and Williams were positioned in Plaintiff's apartment primarily in order to protect her), Plaintiff has failed to state a Tort Claims Act claim against the City with respect to Fite's conduct.[20]

■ It is not clear from the summary judgment record precisely where Shoemaker was located during the "sting." However, assuming that he was using audio equipment to monitor the events in Plaintiff's bedroom, the Court finds that Shoemaker nonetheless acted in good faith. Plaintiff's affidavit indicates that she and Sellars spoke for "a period of time" in the living room and that Sellars talked to her "for a long period of time" before any sexual conduct of a sexual nature allegedly occurred in the bedroom. Callis Affidavit, at 4. This suggests that, even if Sellars remained in Plaintiff's apartment or bedroom for fifteen minutes, as Plaintiff states, the alleged assault did not begin until

---

18. It is not clear that Fite was using any radio equipment at all since he instructed Officer Williams to contact the officers in the surveillance van and advise them that he and Williams could not hear what was going on in Plaintiff's bedroom. Fite Deposition, at 43.

19. *See* Fite Deposition, at 44 (after Williams radioed out to the officers in the surveillance van, Fite asked him if they could hear anything, and Williams responded that they could hear a conversation or some other sounds; at that point, Fite decided to end the "sting"). This suggests Fite's good faith despite the fact that he was not actually monitoring the audio equipment.

20. Even if Fite used and failed properly to interpret and monitor the audio equipment, Plaintiff has not shown that his use of any of the equipment used during the "sting" proximately caused her injuries. *See Washington v. City of Houston,* 874 S.W.2d at 795.

near the end of the period,[21] and Defendants were not simply sitting by listening to Plaintiff being assaulted. Given all the circumstances, Shoemaker had no way of knowing when Plaintiff wanted to end the "sting," even if it did last fifteen minutes. Finally, once Fite gave the signal for the arrest team to move in, Shoemaker acted immediately. This suggests a good faith effort to protect Plaintiff. Therefore, the Court finds that Shoemaker acted in good faith and is protected from suit by official immunity.[22]

As to Plaintiff's claim of defective monitoring equipment, there is no evidence that Shoemaker and Fite did not believe that the equipment was functioning properly prior to Sellars' arrival at Plaintiff's apartment. Indeed, Fite testified that he ran a check on the equipment after setting it up and that everything was working correctly. Fite Deposition, at 35. Fite further testified that he was never informed that there was any problem with the monitoring equipment. *Id.* at 44. Shoemaker testified that the officers in the surveillance van did not inform him at any time during the "sting" that they were having difficulty hearing what was being said in Plaintiff's bedroom. Shoemaker Deposition, at 94. Plaintiff has submitted no evidence to raise a fact question as to Defendants' good faith belief prior to and during the "sting" that the equipment was in working order and adequate for the job. Moreover, as soon as Fite learned that the officers in the surveillance van could hear sounds in addition to conversation in Plaintiff's bedroom, he ended the "sting." This suggests a good faith effort to protect Plaintiff from Sellars' alleged advances.

Plaintiff lastly claims that Shoemaker and Fite were negligent in failing to utilize video transmission equipment or other more sensitive audio transmission equipment. Fite's uncontradicted testimony is that video-monitoring equipment could not be installed in Plaintiff's apartment without being obvious. Fite Deposition, at 61. Fite further testified

that there was no need for video on something that was supposed to be conversation only. *Id.* Finally, Plaintiff's assertion that Shoemaker and Fite were negligent in failing to use more sensitive audio equipment is conclusory. Plaintiff has not established what type of equipment would have been preferable under the circumstances, and has failed to establish that Defendants knew prior to the "sting" that more sensitive audio equipment was required. Therefore, the Court finds that there is no genuine question of material fact that Defendants acted in good faith in selecting and using the monitoring equipment during the "sting."

Because Shoemaker and Fite are entitled to official immunity for their alleged negligence during the "sting," the City is not liable under the Tort Claims Act. Therefore, the City's Motion for Summary Judgment is granted.

### IV. CONCLUSION

For the reasons discussed above, both **Fite's and Shoemaker's and the City's Motions for Summary Judgment are GRANTED,** and all claims against each are **DISMISSED WITH PREJUDICE.**

---

**21.** Plaintiff's affidavit is extremely unclear as to time frames. However, her references to "a period of time" spent conversing in the living room and Sellars' talking to her "for a long period of time" in the bedroom suggest that any sexual contact which allegedly occurred near the end of the encounter.

**22.** Moreover, as discussed above, *see supra* note 16, Plaintiff has failed to allege that Shoemaker's use of the audio equipment proximately caused her harm. *See Washington v. City of Houston,* 874 S.W.2d at 795.